**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Francis KEENAN, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James E. KEENAN, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mark KEENAN, Defendant-Appellant.
Nos. 12239, 12242, 12264.**

United States Court of Appeals
Seventh Circuit.

March 26, 1959.

Rehearing Denied June 11, 1959.

Myer H. Gladstone, Chicago, Ill., for appellant John Francis Keenan.

Jack Arnold Welfeld, Chicago, Ill., Charles A. Thomas, Rockford, Ill., for appellant James E. Keenan, Lucas & Thomas, Springfield, Ill., of counsel.

Melvin L. Klafter, Chicago, Ill., for appellant Mark Keenan, Anna R. Lavin, Kenneth S. Nathan, Chicago, Ill., of counsel.

Clifford M. Raemer, U. S. Atty., Danville, Ill., Howard B. Gliedman, Brooklyn, N. Y., Charles A. McNelis, Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Joseph M. Howard, Richard B. Buhrman, Harlow M. Huckabee, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before DUFFY, Chief Judge, and HASTINGS and PARKINSON, Circuit Judges.

DUFFY, Chief Judge.

On April 30, 1957, an eleven count indictment was filed in the United States District Court for the Northern District of Illinois, charging violation of the Internal Revenue laws and of the conspiracy statute. In the first ten counts John Francis Keenan (hereinafter called Frank Keenan) was the sole defendant. He was charged in Counts 1, 2, 3 and 4 with having wilfully attempted to evade and defeat a large part of his personal income taxes for the years 1950, 1951 and 1952. In Counts 5, 6 and 7, he was

charged with having wilfully attempted to evade and defeat the taxes of Champlin-Shealy Company, a corporation, during the same period. Counts 8, 9 and 10 are not before us. In Count 11 it was charged that Frank Keenan, his brothers, James and Mark, and his sons, George and Edward, were engaged in a continuing conspiracy from the end of 1944 to the date of the indictment. The Champlin-Shealy Company was named as a co-conspirator but not as a defendant.

In substance, Count 11 charged that there was a fraudulent deduction on the books and tax returns of the Champlin-Shealy Company of large sums designated as "Sales Expenses" and "Sales Commissions," the bulk of which—while ostensibly paid to the defendants other than Frank Keenan—constituted unreported taxable income to Frank Keenan; and that Frank Keenan used the other defendants as conduits to channel such income to him. Twenty-one overt acts were listed. During the trial, overt acts 15 through 21 were withdrawn.

The cases were transferred by Judge LaBuy to the Eastern District of Illinois. The trial before Judge Platt and a jury lasted seven weeks. Frank Keenan was found guilty on the first seven substantive counts and on the conspiracy count, but was found not guilty as to Counts 8, 9 and 10. James and Mark Keenan were each found guilty on the conspiracy count, the only count in which they were charged. Edward and George Keenan, the sons of Frank, were found not guilty on the conspiracy count, which was the only count in which they were charged. Frank Keenan was given concurrent two-year sentences on each of the eight counts on which he was convicted, and was likewise fined $7,000.00 on each count. James Keenan and Mark Keenan were each fined $5,000.00 and sentenced to imprisonment for one year and a day.

From the evidence, the jury was entitled to believe the following facts: On December 31, 1944, defendant Frank Keenan acquired, at a cost of $65,106.59, all of the stock of Champlin-Shealy Company which was engaged in the printing business in Chicago. On February 1, 1945, the old corporation was dissolved and a new corporation was formed under the same name. Frank was elected president and Pauline Ross who had been employed by the old corporation for many years, was elected Secretary-Treasurer. Of the 675 outstanding shares, 673 were issued to defendant, one to Ross and one to a third party. On February 27, 1945, defendant resigned as president and transferred his stock in the corporation to James Keenan, who then was elected president. James paid $13,500.00 for twenty percent of the stock, and held the other eighty percent as nominee for Frank Keenan.

From 1934 to 1950, Frank Keenan was an alderman of the City of Chicago. The Government suggests that his resignation as president was prompted by the Illinois statute which forbade municipal officers from doing business directly or indirectly with the city.

Although Frank Keenan claimed that he had nothing to do with the management of the company from 1945 to the end of 1950, there was substantial evidence that Frank was in de facto control of the company. He had his own private office at Champlin-Shealy, and came to the office every week day when he was in Chicago. During this period James was not authorized to sign company checks alone. Frank had the combination to the safe while usually James did not. On several occasions when James learned the combination, and Frank became aware of that fact, the combination was changed. On one occasion in 1948, when James removed some securities from the safe which he put up as collateral for a bank loan, Frank became angry and the safe deposit box of the company at the bank to which Frank, James and Miss Ross had previously had access, was closed out. A new box was opened to which only Frank and Miss Ross had access. In 1947, the shares of the corporate stock held by James as nominee for Frank were transferred to Georgia Keenan, Frank's wife.

In 1950, Frank was elected to the County Board of Tax Appeals and was no longer employed by the City of Chicago. In November, 1950, Frank and James had a violent disagreement resulting in a fist fight. On November 24, 1950, James resigned as president and defendant's son, George, was elected president. James sold his shares of stock in Champlin-Shealy for $75,000.00. Three days later George resigned and Frank was elected president.

The Champlin-Shealy Company never declared a dividend after the Keenans acquired control. Commencing in January, 1945, a corporate check was made out each week in the amount of $150.00 payable to cash, and on the corporate books was charged to "Sales Expenses." In July, 1947, the weekly amount was increased to $300.00, and in April, 1950, to $400.00. Each week these checks would be cashed and Miss Ross would place the cash received in an envelope marked "Sales Expenses." Sometimes Frank would pick up the envelope, and at other times James would do so. Throughout 1950 Frank and James frequently bought cashier's checks out of their shares of the "Sales Expense" checks. After Frank bought out James' interest in the corporation late in 1950, the $400.00 weekly checks continued to be issued and cashed. Of the proceeds, $100.00 would be sent to James' bank in the form of a cashier's check, and the other $300.00 would be turned over to defendant in currency. Between 1948 and 1951 several Internal Revenue agents advised Miss Ross that the corporation would have to keep invoices to substantiate deduction of the lump sum "Sales Expense" checks. This never was done.

During the period when the "Sales Expense" checks were being issued, the company also listed on its books expenses incurred for advertising, travel, entertainment, automobile expense, presents for customers, etc. However, these items were substantiated, and were entirely independent of the lump sum weekly checks hereinbefore described. The total amount of unsubstantiated weekly checks issued between 1945 and 1953 and charged to "Sales Expense" was $145,100.00. The practice of cashing these checks continued until April 15, 1954, the day after Frank Keenan was invited in for questioning by Treasury Agents.

Starting in 1946, the company issued numerous checks for "Sales Commissions." Practically all of the proceeds of these checks came into the hands of Frank Keenan—usually by circuitous routes. In 1946, Mark Keenan was credited with $5,200.85 charged to "Sales Commissions." This was approximately three percent of the net gross sales. On March 14, 1947, a company check for $5,200.85 was issued to Mark. It was endorsed by Mark Keenan and Miss Ross and was cashed at the bank. Mark received $200.00. A cashier's check for $5,000.00 was purchased and turned over to Frank Keenan.

In 1947 Mark was credited with "commissions" of $13,394.56 representing four and two thirds percent of the total net sales. Frank's twenty-two year old son, Edward, was placed on the payroll in July, 1947, and did some clerical work for the company. He was credited with $6,697.28 representing two and one third percent of the total 1947 net sales. $3,500.00 of this sum was paid to Edward four days after he was hired. All of this commission was turned over to Frank Keenan.

James Keenan was credited with $20,091.85 of "Sales Commissions" in 1947. This represented seven percent of total net sales. The same pattern of crediting commissions to the account of James (seven percent), Mark (four and two thirds percent) and Edward (two and one third percent), was followed from 1947 until February, 1950. At that time Edward left the company and Frank's other son, George, then twenty-two years old, was placed on the payroll. For the period from March, 1950 to November, 1950, George did only clerical work but was credited with two and one third percent of the total net sales as "Sales Commissions."

On December 1, 1950, the date Frank Keenan was elected president, the corporation authorized a new schedule of commissions under which George would receive six percent of sales, Mark six percent and Frank two percent. These rates remained in force until the end of 1954. During the years 1950 through 1954, George Keenan, although doing only clerical work, was credited with "Sales Commissions" of more than $108,-000.00. George turned all of this money over to Frank Keenan.

During the years 1947 through 1954, fifty-nine checks were issued by the company payable to Mark, James, George or Edward which totaled more than $112,-000.00. These checks were endorsed by the payee and immediately turned over to Miss Ross to be cashed. The currency was placed in the office safe or in the company's safe deposit box at the bank. The currency was turned over to Frank Keenan as he requested it or was used to purchase cashier's checks for him.

In addition to the fifty-nine double endorsed checks there were forty-five corporate checks charged against the accounts of James, Mark, Edward or George which totaled more than $154,-000.00. The proceeds of these checks were used among other things to purchase securities for Frank Keenan; deposited in his personal bank accounts; used to purchase bank drafts which were sent to California and deposited there to the credit of the Oaks Hotel (owned by Frank Keenan); deposited directly in a California bank in the account of the Oaks Hotel. Checks totaling nearly $42,-000.00 were cashed but the disposition of the proceeds could not be traced.

### Frank Keenan

Frank Keenan mantained a set of personal books which were kept by Helen McGovern, who was his secretary for twenty-three years until April, 1955. In August, 1950, a new account was set up entitled "Loans Payable—Securities." When Miss McGovern would receive large sums of money of which she did not know the source, she would sometimes credit them to "Loans Payable—Securities" and sometimes not. The first time Frank ever told Miss McGovern that he had borrowed money from a particular individual was in December, 1953, when he showed her a check from James. On several occasions the auditor Kaempfer attempted to allocate the "Loans Payable" and the "Loans Payable—Securities" accounts but he never was able to do so.

On September 3, 1954, defendant filed a financial statement with a California bank. He certified his only liability was an $84,000.00 mortgage on the Oaks Hotel. The liability item entitled "Due to Partners, Employees, Relatives * * *" was left blank.

This detailed statement of the transactions involving the "Sales Expense" checks and the "Sales Commission" checks is made necessary because of the argument on this appeal by Frank Keenan that all of the sums received by him from these sources were loans to him from his brothers, James and Mark, and from his sons, Edward and George. In effect, Frank Keenan challenges the sufficiency of the proof relating in particular to the first four counts of the indictment.

On the first four substantive counts the main issue which the jury had to resolve was whether the bulk of the $115,683.93 paid by the corporation as "Sales Commissions" to Mark and James during the years in question and all of the $50,715.-77 paid to Frank's sons in the same period, were, in fact, loans to Frank Keenan. If they were not, clearly such sums were unreported income upon which Frank had paid no income tax. By its verdict the jury rejected Frank's claims that they were loans. There is abundant evidence in this record to support that conclusion.

Frank Keenan strongly urges that the great amount of testimony and evidence introduced for the purpose of proving a "net worth" case was prejudicial error; that the large volume of exhibits received in evidence confused and overwhelmed the jury.

■ The Government did endeavor to establish its case by two lines of proof: a) specific items of unreported income, and b) the net worth method. With the proof so clear as to specific items of unreported income, it is somewhat difficult to understand why resort was had to the net worth method. However, there may well have been reasons sufficient in the minds of those in charge of the prosecution why it was prudent to have two strings to their bow. In any event, we cannot say there was prejudice to the defendants amounting to reversible error where no lack of good faith is evident in the adoption of the trial strategy which was used.

■ We are of the view that the jury's verdict that Frank Keenan was guilty of the charges in Counts 5, 6 and 7 is amply supported by the record before us. Much of the evidence which we have heretofore detailed is pertinent in considering these three counts which relate to the alleged wilful attempt of Frank Keenan to evade and defeat the taxes of Champlin-Shealy Company for the years 1950, 1951 and 1952. The evidence supports the charge that large sums paid out by the corporation and charged to "Sales Expense" and "Sales Commissions" were not legitimate payments for expenses actually incurred. The jury was justified in believing such payments were merely a means of siphoning off unreported profits of the company for the personal benefit of Frank Keenan who, with his wife, was the *de facto* owner of eighty percent of the corporate stock until 1950, and ninety percent of the stock thereafter.

Frank Keenan claims that the charges against him in Counts 1 and 5 are barred by the statute of limitations. Count 1 charges commission of the offense therein described "on or about the fifteenth day of March, 1951." The individual tax return of Frank Keenan and wife was filed March 14, 1951. Count 5 charges that on or about March 15, 1951, Frank Keenan attempted to evade and defeat the taxes due by Champlin-Shealy Company for the year 1950. This return was filed March 13, 1951.

The indictment herein was returned on April 30, 1957, six years and forty-six days after the date of the commission of the offenses described in Counts 1 and 5. The pertinent statute of limitations bars prosecution after six years except "Where a complaint is instituted before a commissioner of the United States within the period above limited, the time shall be extended * * *" Section 3748(a), Internal Revenue Code 1939, 26 U.S.C.A.

A supplement to the record shows that a complaint was, in fact, filed before a Commissioner on March 13, 1957. However, it is undisputed that this complaint or the record thereof was not in the District Court files at the time of the trial. Government's counsel and counsel for the defendants incorrectly assumed that it was on file, and the Government offered no proof to show that prosecution was not barred by the statute.

Frank Keenan relies upon two Fifth Circuit cases, White v. United States, 216 F.2d 1, and Flemister v. United States, 260 F.2d 513. In White, the question was brought into focus by a petition for rehearing. The appellant there pointed out that the Commissioner's records had not, in fact, been forwarded to the clerk at the time of the trial, and that the trial judge had, in ruling on motions based on the statute of limitations, incorrectly assumed such records were in the file. The court said, 216 F.2d at pages 7 and 8: "If in fact the papers had not been so transmitted at the time of trial, then they had not become in any sense a part of the record upon which the District Court could rely in ruling as a matter of law that the prosecution was not barred by the statute of limitations." The Court of Appeals refused to direct a judgment of acquittal but ordered a new trial.

In the Flemister case, similar confusion existed. When the district judge denied defendant's motion to dismiss, he said he took judicial notice of the proceedings before the Commissioner "which have been transmitted to the Clerk of the District Court." [260 F.2d 515.] On appeal the record showed that the

Commissioner's records had not been forwarded. It also showed that a complaint had not been filed with the Commissioner; that the only proceeding before the Commissioner was the signing of an affidavit averring the truth of the facts which were subsequently made the basis of the indictment. The court held that the signing of the affidavit did not amount to the "institution" of a complaint before the Commissioner within the six-year period.

The holding of these two cases adequately supports the proposition that a trial judge errs in overruling a motion to dismiss when he relies, through judicial notice, on something that does not exist in the record.

We do not think that either case is applicable to the situation before us. The trial judge below was never given an opportunity to rule on the point. The motion to dismiss raised the issue of the statute of limitations only with respect to Count 11. The amendment to this motion was likewise directed only to Count 11. Motions for judgment of acquittal and for a new trial did not raise the issue of limitations at all. In fact, trial counsel for Frank Keenan expressly disavowed any intention to raise the statute of limitations as a bar to the first ten counts.

 We hold that as no objections were raised in the pleadings or upon the trial, the Government was not required to prove that the prosecution was not barred by the statute of limitations. We hold further that the defendant is in no position to raise the point for the first time on this appeal. Had this point been timely raised below, there would have been ample opportunity for the Commissioner to file the records with the District Court.

We have considered the claims of Frank Keenan that prejudicial and erroneous instructions were given to the jury and that error was committed in failing to instruct the jury in other respects, particularly with reference to the withdrawal of overt acts 15 through 21. It would unnecessarily prolong this already lengthy opinion to discuss these points in detail. We merely say that we think these claims are without merit.

 Frank, as well as the other defendants, claim that the prosecuting attorney was guilty of prejudicial conduct. There is, indeed, basis for some criticism as to the manner in which the prosecuting attorney conducted himself. At times he seemed to forget the admonition in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, that a United States Attorney is the representative of a sovereignty whose obligation is to govern impartially " * * * and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done * * *." See also United States v. Levi, 7 Cir., 177 F.2d 827.

 Although the quotation from the Berger case refers to the United States Attorney, the same standard is, of course, applicable to attorneys sent by the Department of Justice to prosecute a criminal charge as happened in the case at bar. However, we have finally concluded that in the setting of the evidence of this case, there was no prejudicial error in this respect, and we so hold.

### Conspiracy Count

We next consider Count 11 which charged conspiracy. Frank, James and Mark Keenan were all found guilty on this count. Defendants argue a fatal variance existed between the charge in the indictment and the proof in that the proof showed, if anything, a number of smaller independent conspiracies. Defendants rely heavily on Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

 We hold the jury was justified in finding from the evidence there was one continuing general conspiracy to defraud the Government of the taxes due from defendant and the Champlin-Shealy Company. The manipulation by which the "Sales Commission" checks over a period of years were ostensibly paid to James and Mark, endorsed by them, and then converted into currency which was

paid over to Frank Keenan, points to a general continuing conspiracy. There can be no question but that James and Mark knew the part the other played in the conspiracy. As an illustration: On December 28, 1950, the company issued two checks, one to James for $5,000.00 and one to Mark for the same amount. Mark got James' check by mistake and endorsed it; George got Mark's check by mistake and he endorsed it. The checks were exchanged so that the proper endorsements could be written in by James and Mark above the incorrect endorsements. This establishes a pattern of knowledge by James and Mark of the continued conspiracy during the period in question, and the part each played therein.

We think the Kotteakos case is clearly distinguishable. There the central figure through whom fraudulent applications for housing loans were processed, had pleaded guilty and was not before the court. The indictment sought to link in one conspiracy thirty-two defendants who had, each for his own purpose, used the same intermediary. There was no showing that each of the thirty-two had knowledge of the activities of the other or that there was any central scheme in operation. That situation does not obtain in the case at bar.

## Mark Keenan

Much of the evidence hereinbefore quoted in considering Frank Keenan's appeal, is pertinent on the appeal of Mark Keenan. Several contentions made by Mark have already been discussed with reference to Frank's appeal. We shall not repeat them.

Mark was not a salesman. During the entire period between 1946–1954, when Mark was credited by the corporation with $174,522.84 of "Sales Commissions" he had a full time job with the City of Chicago. He never obtained any orders for the company but did drop into the company office once or twice a week to read the newspapers. Mark was never a director or officer of the Champlin-Shealy Company nor did he receive a salary.

Mark testified at the trial that Frank had owed him $83,000.00 ever since 1953; that he never kept records of the amounts turned over to Frank; that such records appeared in the company's books, although he admitted he never had seen the inside of those books. In 1955, Mark borrowed $600.00 and $800.00 from a bank on dates when the corporate books showed he had balances due him of $41,614.68 and $51,949.42 respectively. Mark steadfastly insisted at the trial that all proceeds of checks payable to him which were turned over to Frank were loans from him to Frank. The jury didn't believe him.

██ Mark complains of "deception" and "trickery" on the part of Government Agents Freiberger and Foreman, claiming that they elicited a statement from him on the representation they were investigating his civil tax liability. He also complains because of the admission into evidence of the statement taken from him by Special Agent Levin. Mark also asserts error because the court refused to give requested instructions to the jury on these matters. We do not think there was sufficient evidentiary basis for the proposed instructions, hence no error was committed. Nor was there error because the Government did not call Agent Freiberger. The defendants had Freiberger under subpoena and might have called him if they wished. We also find no error in the admission into evidence of a transcript of Mark Keenan's interview with a Treasury Agent.

██ Mark insists, as do Frank and James Keenan, that statements made by them in 1957 should not have been received into evidence because, it is claimed, the jury could not follow the court's instruction that each such statement was offered only against the defendant who made the statement. Defendants had been furnished with verbatim copies of these statements and had long known

the Government would offer them in evidence as the making of each statement was spelled out in the indictment as an overt act. Nevertheless, no motion for a severance was made. In effect, defendants consented to a joint trial at which all defendants and all eleven counts would be tried together. Furthermore, the statements were not confessions but were exculpatory statements made during the life of the conspiracy. We hold these claims of error are without merit.

██ Counsel for Mark Keenan strongly insists the trial court erred in admitting grand jury testimony given by Mark at a time it is now claimed he was a putative and targeted defendant. He also claims Mark was compelled to give evidence against himself before the grand jury. James Keenan makes a similar argument.

Mark was only a potential defendant when he testified. The statement of the court in United States v. Benjamin, 2 Cir., 120 F.2d 521, 522 is pertinent. The court said: "It is to be remembered that the appellant had not the constitutional privilege to refuse to testify which belongs to a defendant on trial. He was subject to call as a witness and only had the right of any witness to decline to give answers when interrogated which might tend to incriminate him [citing cases]. As Professor Wigmore has said, the privilege is 'an option of refusal and not a prohibition of inquiry.' Wigmore Evidence 2d Ed. § 2268 * * *"

██ Mark Keenan claimed he was intimidated by a threat made by Judge Barnes that he would send him to jail. Mark was summoned to appear before the April, 1957 grand jury. He was instructed as to his constitutional rights. He stated that on the advice of his attorney, he would refuse to answer any and all questions regardless of whether his answers would tend to incriminate him. The Government applied to Judge Barnes for an order directing him to answer certain questions. It was then that Judge Barnes said: "There seems to prevail around this courthouse on the Fifth Amendment that if somebody, if one claims the Fifth Amendment, you can't compel him to answer any questions. That is a gross mistake, and I guess we will have to send somebody to jail to assure people it isn't the fact." Thereafter, Mr. Busch, one of the counsel for defendants, agreed that the questions should be answered. It was further agreed that Mark and James would be permitted to consult with their counsel at any time while they were appearing before the grand jury. None of Mark's testimony before the grand jury was read to the trial jury except as it was used on cross examination. We hold that there was no error in this respect.

Mark makes several other claims of error. We have carefully considered each of them. We find no prejudicial error existed with respect to any of these contentions.

### James Keenan

██ James Keenan was found guilty of conspiracy as charged in Count 11. Many of the claims made upon behalf of James have been covered in our discussion of claims of error made by Frank and Mark Keenan. These points will not be again discussed.

James Keenan left the corporation in 1950. During the trial his counsel frequently objected to evidence on the ground the transactions occurred between 1951 and 1955 which he claimed could not be binding on James. The trial court made it clear that any defendant could make an objection at any time but if such objections involved constant repetition of a theory of defense, same should be done out of hearing of the jury. The court later instructed the jury "If you believe from all of the evidence and under these instructions beyond a reasonable doubt that a defendant was a member of the conspiracy as charged in the indictment at any time, such conspirator remained a member of the conspiracy until it is shown that he has taken some affirmative or definite step, or steps to disassociate himself from the alleged conspiracy. Disassociation from the Champlin-Shealy

Company in itself is not such an affirmative step."

James takes vigorous exception to that part of the charge that disassociation from the corporation was not, in itself, a sufficient affirmative step to disassociate the defendant from the conspiracy. In view of the testimony which clearly established a continuance of the conspiracy long after James left, and the participation of James in that conspiracy, we hold the instruction was not erroneous.

Equally without merit is James' contention that the trial court forgot to instruct the jury that the last seven overt acts listed in Count 11 had been withdrawn by the Government. We think it clearly established that the trial judge's secretary retyped the indictment deleting the last seven overt acts, and it was this retyped indictment that was given to the jury.

Counsel for James argues that his conviction was barred by the statute of limitations claiming he committed no overt act within the six-year period in furtherance of the conspiracy. Of course, this is not necessary as long as an overt act was committed by any of the co-conspirators within the six years prior to the return of the indictment on April 30, 1957. Moreover, we think there was ample proof that James did commit overt acts within the six-year period, such as falsely stating to the Treasury Agents in 1954 that his "Sales Commissions" turned over to Frank were merely loans, and that Frank owed him approximately $85,-000.00.

Other claims of error made by James which have not been heretofore specifically mentioned or covered in discussions of claims of error made by Frank and Mark, are without merit and are hereby overruled.

The judgment of conviction as to John Francis Keenan in No. 12239; the judgment of conviction as to Mark Keenan in No. 12264, and the judgment of conviction as to James Keenan in No. 12242 are each

Affirmed.