**Braxton C. WALLACE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7958.**

United States Court of Appeals
Fourth Circuit.

Argued March 16, 1960.

Decided Aug. 12, 1960.

**658**

Hal Lindsay, Atlanta, Ga., for appellant.

Robert A. Clay, Asst. U. S. Atty., Greenville, S. C. (Joseph E. Hines, U. S. Atty., Spartanburg, S. C., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and BUTLER, District Judge.

BOREMAN, Circuit Judge.

Braxton C. Wallace, a lawyer and certified public accountant, was indicted for violation of the Internal Revenue Laws. The indictment contained four counts, the first count charging that Wallace combined, conspired, confederated and agreed together with one Maurice Puckett (who was indicted with Wallace, entered a plea of guilty to each count prior to trial and was sentenced) that they would prepare and cause to be prepared false and fraudulent income tax returns in violation of 26 U.S.C.A. § 145(b) of the Internal Revenue Code of 1939.[1]

Four specific overt acts were charged to have been committed in furtherance of the conspiracy. The second, third and fourth counts charged the attempt to evade or defeat the income tax of Maurice Puckett for the years 1951, 1952 and 1953 by preparing, or causing to be prepared, false and fraudulent income tax returns and filing or causing said returns to be filed in violation of § 145(b) mentioned above. Wallace was tried and convicted on each of the four counts in the United States District Court for the Western District of South Carolina, Greenwood Division, and prosecutes this appeal from a denial of his motion for judgment of acquittal or, in the alternative, for a new trial under Rule 29(b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.

Specifications of error are directed at almost every phase of the trial proceedings in this case. With due regard for limitations as to time and space, we shall touch upon only those points which merit discussion.

Preliminarily, the evidence indicates that Wallace is a resident of Greenwood, South Carolina, where he, at the time of trial, had been a lawyer and certified public accountant for some thirty-five years. Wallace had known Puckett for about twenty-five years. During this period he had handled any number of legal matters for Puckett and had done such accounting work as Puckett had required, including the preparation (or supervision of the preparation) of all tax returns for Puckett, Puckett's family and the various corporations and other interests held by Puckett. Additional pertinent facts will be related in the discussion of the points of error.

---

1. 26 U.S.C.A. § 145, Internal Revenue Code of 1939

"Penalties

\*   \*   \*   \*   \*

"(b) Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution."

### Sufficiency of the Evidence

Maurice Puckett owned and operated a number of hotels by and through corporations created or purchased for that purpose. As evidence relating to all counts of the indictment, the Government offered proof of hundreds of instances in which personal items purchased by Puckett and members of his family were charged to operating and maintenance expense accounts of these various hotels without a subsequent charge against the personal account of Puckett. There is no dispute that these items were improperly handled and, under Section 145(b) of the Internal Revenue Code of 1939, any person who wilfully attempts to escape the payment of income taxes by this devious method is guilty of a felony.

Attempting to connect Wallace with these improper transactions, the Government produced a number of witnesses. Maurice Puckett stated that he employed Wallace "to keep my bookkeepers straight and make my tax returns". Puckett, when asked as to whether Wallace knew that personal bills were being paid by and charged to the hotel, answered that he and Wallace never discussed the personal bills and that Wallace was there to check the books. Government's witness, Hugh Shearouse, a former resident auditor with the Savannah Hotel Operating Company, hereinafter called S. H. O. C., in Savannah, Georgia, a corporation owned by Puckett, testified that in a conversation he told Wallace, "in my opinion Mr. Puckett was putting some things on the Savannah Hotel Operating books that would not—were not permissible"; that Wallace then turned to Puckett, who had just entered the room, and said: "Mr. Shearouse tells me that we are putting some items on the Savannah Hotel Operating books that he does not think that will get by". Mr. Shearouse qualified this statement by adding "or words to that effect". The Government also produced records of instructions given by Wallace to Mr. Russel Holmes, the resident auditor of S. H. O. C. at the time Puckett bought the stock of the company. Mr. Holmes died in 1952. These instructions directed Holmes to make certain entries, as well as telling him to continue using the same system of bookkeeping as had been used when the company was under different management. Mr. Joseph R. Harmon, the Special Agent of the Internal Revenue Service who investigated the case, stated that he did not see how Wallace could have given such instructions without being thoroughly familiar with the books. Another link in the chain of proof against Wallace was the testimony of E. M. Turlington, a certified public accountant who is the vice president and secretary of the hotel chain from which Puckett bought S. H. O. C. Turlington stated that if he had supervision of the accounting of a corporation, he would at least make a spot check of the books, and that in the instant case a spot check would have disclosed that purchased personal items were being charged to corporation expenses.

In defense Wallace contended he was employed to make tax returns from information furnished him either by Puckett or the resident auditors of the various hotels; that he did not supervise the auditors to the extent that he checked the books, and that his only responsibility was to answer any questions the auditors might have. He explained his instructions to Mr. Holmes by stating that these were given solely to indicate to Mr. Holmes how the new management wanted the books kept; that such instructions did not require any special knowledge of these particular books but only a knowledge of the bookkeeping system that was to be continued. He places special emphasis on the fact that not one of the resident auditors who testified in the case said that he had ever received instructions from Wallace as to how specific items should be handled.

■■ This point of error is not well founded. The evidence is, of course, conflicting as to whether Wallace had knowledge that personal items were being charged to hotel expenses. However, there is sufficient evidence from which a jury could have concluded that Wallace

did have such knowledge. In determining the sufficiency of evidence to sustain a conviction, the question is not whether the evidence foreclosed all possibility of doubt in the mind of the court, but whether the evidence, construed most favorably for the prosecution, was such that a jury might find the defendant guilty beyond a reasonable doubt. Crawley v. United States, 4 Cir., 1959, 268 F.2d 808. See United States v. Brill, 3 Cir., 1959, 270 F.2d 525.

### The Conspiracy Count

█ Count one of the indictment charges that from October 23, 1945, to and including the date of the filing of the indictment, "the defendant, Braxton C. Wallace, Certified Public Accountant and attorney for Maurice Puckett, did combine, conspire, confederate and agree together with the defendant, Maurice Puckett, that they would prepare and cause to be prepared *false and fraudulent income tax returns in violation of Section 145(b)*, Title 26, Internal Revenue Code of 1939 * * *" (Emphasis supplied.) It will be noted that the count as laid does not charge Wallace and Puckett with conspiracy to prepare false and fraudulent income tax returns of Puckett but simply charges them with conspiracy to prepare unidentified false and fraudulent tax returns.

Five overt acts are charged to have been committed in furtherance of the conspiracy. The court instructed the jury that the first three of these overt acts, having been alleged or shown to have taken place more than six years prior to the filing of the indictment, were barred by the statute of limitations (26 U.S.C.A. § 3748, Internal Revenue Code of 1939). The court further instructed the jury that these three overt acts and the evidence adduced in support thereof could only be considered in determining whether or not such a conspiracy as that described in the indictment existed at the time such overt acts were alleged to have taken place; that Wallace could not be found guilty under Count One of the indictment unless the jury should find from the evidence beyond a reasonable doubt that, at the time of the alleged commission of overt acts four and five, such a conspiracy existed between the two defendants, and that overt acts four and five were committed by the defendants by the filing of a false and fraudulent income tax return for the taxable year 1951 with intent thereby to evade and defeat the tax. These instructions were given with defendant's consent.

The first overt act charges the defendants, Wallace and Puckett, with back-dating a deed, executed by a Puckett-owned corporation and conveying certain real estate in Charlotte, North Carolina, from one fiscal year to another in order to take advantage of a net operating loss carry-back, thus "defrauding the Government of tax on the gain on said sale of real estate". There was no evidence introduced on behalf of the Government to show that the mere back-dating of the deed would effect or produce a tax loss to the Government. In fact, the defendants' evidence tended to show that the alleged back-dating did not affect the tax result. Thus, because of manifest lack of proof, the alleged overt act does not aid or support a design or intent on the part of Wallace to conspire to prepare false and fraudulent tax returns or to evade the payment of income taxes. Special Agent Harmon, when testifying as a witness for the Government, stated that the indictment should have alleged that by this transaction Maurice Puckett personally escaped taxation on the gain. His observation was undoubtedly prompted by the fact that the only evidence presented by the prosecution in this connection might tend to prove such a charge. Assuredly, what witness Harmon thought the indictment should have contained is immaterial.

The second overt act charges that the defendants "caused to be made an entry on the books of the Savannah Hotel Operating Company, whereby one-half of the capital stock of Savannah Hotel Operating Company was retired in the form of a dividend which caused the United

States to be defrauded out of tax on the dividend of $69,529.78 in violation of the Internal Revenue Code of the United States, in that the dividend was not reported on the Income Tax Return of Maurice Puckett as prepared by Braxton C. Wallace for that year and signed by Maurice Puckett".

The evidence indicates that Puckett and Wallace negotiated the purchase of all of the capital stock of S. H. O. C. from Carling Dinkler, Jr. A stock certificate representing the full number of shares in S. H. O. C. was then issued to Puckett. He paid a certain sum down and agreed to pay the balance at $2,500 per month plus interest on the balance remaining after each payment. As security for the deferred payments, Dinkler held the stock certificate. Wallace then notified the resident auditor at S. H. O. C. to prepare a check for $2,500 and accrued interest each month, such check to be signed by Puckett and delivered to Dinkler. About six months later, Wallace notified the auditor at S. H. O. C. that the interest on the sums paid to Dinkler should be charged against Puckett's personal account and instructed the auditor to make the necessary corrective entries removing such interest payments from the hotel "Interest Paid" account and charging them to Puckett personally.

At some time between the date of issuance of the original stock certificate to Puckett and the date upon which one-half of the stock was retired, stock certificates were issued to both Mr. and Mrs. Puckett, each in the amount of one-half of the original number of shares of stock. The evidence on this point is somewhat hazy, but it is the Government's contention that Wallace set up this sham transaction at the time of the actual stock retirement and back-dated the stock certificate stubs to give the tax treatment of this transaction an appearance of legality. Wallace contends, however, that the issuance to both Mr. and Mrs. Puckett took place either on the same day or the morning following the date of the original issue to Puckett; that the original certificate could not have been canceled earlier because it was in the custody of Dinkler; and that, therefore, Mrs. Puckett was the sole owner of all the stock that was retired. Whether or not the stock certificate stubs were back-dated is of no moment and the District Court instructed the jury that ownership of the stock on the actual date of cancellation or redemption is controlling in the determination of tax liability.

Section 115(g) (1) of Title 26, U.S. C.A., Internal Revenue Code of 1939, provides:

"If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

A comment upon this section is found in Treas.Reg. § 29.115—9 (1941), as follows:

"The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution. * * * On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. * * * *"

Wallace, of course, contends that since Mrs. Puckett was the actual owner of the

662

redeemed stock as of the date of its redemption, under the above quoted regulation no constructive dividend resulted.

We are of the opinion that the jury, from the evidence presented in support of this overt act, could have concluded that this transaction was a sham and that Wallace and Puckett had at that time engaged in a conspiracy to prepare false and fraudulent tax returns with the design and intent to defraud the Government. The evidence discloses that Mrs. Puckett did not put any money into the stock transaction; that all amounts in excess of the down payment, and a sum representing the assumption of liability on certain purchases made by Dinkler, were paid by the corporation. No entries on the books of the corporation indicate a loan to Mrs. Puckett. Mrs. Puckett received nothing when the stock was retired. A further indication that the corporation itself was redeeming the stock directly from Dinkler for the benefit of all shareholders is that the entries made at the time the redemption took place were described as follows: "Debit capital stock $1,670 [the par value of the stock]; debit capital surplus, $67,-859.78. Credit Carling Dinkler, Jr., account, $69,529.78." This chain of circumstantial evidence is ample to sustain the jury's determination that Wallace and Puckett had then formed and were engaging in the conspiracy charged in the indictment.

In substance, the third overt act charges that S. H. O. C. maintained two bank accounts, one in Savannah, Georgia, and the other in the Piedmont National Bank of Spartanburg, South Carolina; that the Piedmont National Bank account was used to pay personal expenses of Puckett and his family, the books of S. H. O. C. being balanced without entry of any of these personal items; and that to this end the defendants treated these personal items as deductions for tax purposes to S. H. O. C., whereas, they should have been treated as a constructive dividend to Puckett.

The objective of the Government relative to this overt act was to show that Wallace had intimate knowledge of the books of S. H. O. C. and that he made false and "forced" entries on the books of the company to balance the bank account. The evidence, as elicited from Revenue Agent Gillett, was that a balance of $14 remained after appropriate charges had been made against a credit balance in favor of Puckett in the bank account of S. H. O. C. The credit balance in favor of Puckett resulted from the sale of a 1948 Buick automobile by him to S. H. O. C. for which he received no direct payment. On the books of the corporation this $14 item was charged, without any showing of justification, to interest expense. This transaction the Government refers to as a "forced" entry.

Wallace contends that at no time did he attempt to reconcile the bank account and did not make any such entry on the books of S. H. O. C.; further, that the Government's computation as to the charges to be made against Puckett's credit balance in the Piedmont Bank is erroneous and the true computation reveals that Puckett has remaining in that account a credit balance of nearly $1,000.

Once again the jury was confronted with conflicting evidence, a substantial part of which could support a determination that in December 1949 Wallace and Puckett had formed and were engaging in the conspiracy as charged.

The fourth overt act charges that in 1950 and 1951 the defendants caused some $14,300 of air conditioning units to be purchased and installed in the Savannah Hotel and that, through a series of entries on the books of S. H. O. C., Puckett was paid some $16,000 during the years 1951 and 1952 as rentals of these units over and above the original cost of the units, which sums were not reflected in the income tax returns of Puckett prepared by Wallace.

Puckett leased from the owner the building in which the Savannah Hotel was located. Puckett decided that he would need air conditioning units to meet competition, and was advised by Wallace to purchase the air conditioners in his

own name and collect his money back through rental of the units to guests. Wallace apparently gave this advice after he had interpreted a certain covenant in the lease to mean that any fixtures such as air conditioners installed by the lessee would automatically become the absolute property of the lessor. Puckett testified that he instructed the resident auditor and Wallace to cut off further payments after he had been repaid his original investment.

Wallace defends upon the ground that his advice as to Puckett's recovery of the original cost of the air conditioners in no way affected any tax claims the Government might have had; that since he did not check the books of S. H. O. C., he did not know and could not have known that Puckett was receiving money in excess of his investment; and that since the tax returns were prepared solely from information furnished him by the taxpayer, he was guilty of no wrong because he received no such information.

As was discussed under the heading, "Sufficiency of the Evidence", since there was evidence from which the jury could have concluded that Wallace had knowledge of the contents of the S. H. O. C. books and he thus knew that Puckett was receiving moneys in excess of his original investment, the jury could have further concluded that Wallace improperly omitted such income from Puckett's personal income tax return pursuant to the alleged conspiracy.

It will be noted that this overt act is charged as having been committed within six years prior to the finding of the indictment and in furtherance of the alleged conspiracy. The jury could have found, from this evidence, that the fourth overt act was committed as charged.

In Di Bonaventura v. United States, 4 Cir., 1926, 15 F.2d 494, 495, Judge Parker, quoting from Fisher v. United States, 4 Cir., 1926, 13 F.2d 756, 757, said: " 'conspiracy' exists whenever there is a combination, agreement, or understanding, tacit or otherwise, between two or more persons, for purpose of committing unlawful act". Here, while there is no evidence of a specific agreement to prepare or cause to be prepared false and fraudulent tax returns with the intent to evade the payment of income taxes, the conduct of the parties and the inferences to be drawn from such conduct indicate, at least, a "tacit" understanding to accomplish the object of the alleged conspiracy. Martin v. United States, 10 Cir., 1939, 100 F.2d 490, 497; Wilder v. United States, 10 Cir., 1938, 100 F.2d 177, 182. See also United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128.

The fifth overt act is identical to that alleged in the second count of the indictment and will be later considered under the heading "Substantive Counts".

We are of the opinion that the evidence was sufficient to sustain a conviction of Wallace under Count One of the indictment.

### Substantive Counts

Counts Two, Three and Four charge the defendants, Wallace and Puckett, with knowingly attempting to evade the payment of income taxes by preparing or causing to be prepared false and fraudulent income tax returns for the respective years of 1951, 1952 and 1953, wherein Puckett's net income was materially understated with a corresponding understatement of the tax due thereon.

The alleged omissions from income for the year 1951 include the air conditioner income and the personal expenses of Puckett paid by and charged to S. H. O. C. We have already concluded that the evidence as to both is sufficient to sustain the jury's verdict. In addition, there was evidence that Puckett received checks in the amount of about $3,000 from the Savannah Hotel Package Shop which were not included in his income tax return for 1951. The explanation offered for these checks was that Randolph Puckett, Maurice Puckett's brother, worked at the Savannah Hotel and, as a part of his compensation, was to receive the income from the Package Shop; that Maurice Puckett had put Randolph through college and it was impliedly un-

derstood that Randolph was to repay Maurice as he could. The checks in question were drawn on the Package Shop, made payable to either cash or the Piedmont National Bank and were either signed or endorsed by Maurice Puckett. Defendant, Wallace, contends that, under the circumstances, the amounts of these checks were not shown in Maurice's tax return because they were not income. Randolph, however, testified that he did not know the checks had been issued.

We can understand that the jury could easily reject the explanation that these checks were intended to repay a loan from Maurice to Randolph. It is true that the only evidence presented on the Government's behalf was that the checks were disbursed to Maurice Puckett. However, the explanation offered by Wallace as to these checks does not necessarily destroy their probative value. While the burden of proof does not shift in a criminal case, it is the rule that when the Government establishes a prima facie case, it is then for the defendant to overcome the inferences reasonably to be drawn from the proven facts. Thus, evidence of unreported funds or property in the hands of a taxpayer establishes a prima facie case of understatement of income, "and it is then incumbent on him to overcome the logical inferences to be drawn from such proof." Davis v. United States, 6 Cir., 1955, 226 F.2d 331, 336. See also United States v. Lennon, 2 Cir., 1957, 246 F.2d 24, 27; Beard v. United States, 4 Cir., 1955, 222 F.2d 84, 94; Bell v. United States, 4 Cir., 1950, 185 F.2d 302, 309. Even though the defendant became a witness and sought to explain, the jury was not bound to accept his explanation. United States v. Hornstein, 7 Cir., 1949, 176 F.2d 217, 220; United States v. Zimmerman, 7 Cir., 1939, 108 F.2d 370, 373.

The items of income alleged in Count Three to have been improperly omitted from Puckett's 1952 return are additional and continuing items identical with those allegedly received by Puckett during the fiscal year 1951 and omitted from the return for that year. The evidence concerning these items has been discussed. For the year 1953 the alleged omissions pertain primarily to the expensing to S. H. O. C. of various purchases personal to Maurice Puckett and members of his family. We have hereinbefore dealt with these items.

For the reasons assigned and discussed, if the evidence on all counts of the indictment had been fairly presented, we cannot say that it is insufficient to sustain the jury's verdict. However, for other reasons hereinafter stated, we are of the opinion that prejudicial error was committed by the District Court and the United States Attorney, which leaves us no alternative but to send the case back for a new trial.

Prejudicial Conduct by District Court and United States Attorney

In Simon v. United States, 4 Cir., 1941, 123 F.2d 80, 83, this Court commented upon the duties of a trial judge in conducting a case before a jury:

" * * * It cannot be too often repeated, or too strongly emphasized, that the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases heard before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself. He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other. * * * The judge is the only disinterested lawyer connected with the proceeding. He has no interest except to see that justice is done, and he has no more important duty than to see that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury."

See Hoffler v. United States, 4 Cir., 1956, 231 F.2d 660. This is not to say, however, that the trial judge is surrounded

by an impregnable cloak of immunity. As is stated in Graham v. United States, 4 Cir., 1926, 12 F.2d 717, 718:

" * * * In the discharge of this high function, it is, however, of the first importance, both to the particular defendant who may be on trial and to the administration of justice generally, that every one shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate."

See Quercia v. United States, 1933, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321; Virginian Ry. Co. v. Armentrout, 4 Cir., 1948, 166 F.2d 400, 405, 4 A.L.R. 2d 1064.

While no useful purpose would be served in reproducing all of the alleged improprieties in the case at bar, we shall point specifically to such conduct as we feel may have been prejudicial to Wallace.

Witness Maurice Puckett was asked whether Wallace knew personal bills were being paid by the hotel corporation. Mr. Puckett answered that it was never discussed between them and that he (Puckett) did not know they were being paid by the hotel. Then followed a series of questions by the Court, the net result of which may well have influenced the jury. Puckett stated, "Mr. Wallace and me, while that was operating, Savannah Hotel, never did discuss my personal bills." The Court then said, "That doesn't answer the question yet. The question he asked: do you know of your own knowledge whether or not Mr. Wallace knew that the hotel paid your personal bills? Do you know that?" Puckett answered, "The only thing I can say is that he was there to check the books," to which the Court replied, "That answers it. Go ahead." We are unable to see that the last answer by Puckett was more satisfactory, informative or revealing than the first. The jury may have construed the Court's statement to mean that it, the Court, felt that since Wallace was there to check the books, he must have known that Puckett's personal items were being paid by the hotel.

The next incident occurred when Puckett was being questioned with reference to a conversation with Wallace which took place sometime after the conspiracy was alleged to have ended and after the two were indicted.[2] We are of the opinion that this colloquy may have unduly influenced the jury to accept the Court's first pronouncement that the statement was against interest. The statement of Wallace as recited by Puckett was patently self-serving and would admit of no other construction but the jury may have attributed greater weight to the Court's interpretation of the language than to the language itself. Since the evidence upon which the conviction was based would not necessarily preclude acquittal, we have the clear impression that the Court's comments were prejudicial and

---

2. Witness: Maurice Puckett.

"Q. (By Mr. Clay) Did he say anything else to you with regard to it, Mr. Puckett?

"A. I believe that was about all. I believe he did say to me that I knew that he did not know anything about them. [Referring to personal expenses of Puckett paid by hotel.]

"The Court: What did you say?

"The Witness: I said: 'Well, that's what I thought you knew. I thought you were checking the books. I thought you knew that.'

"Mr. Watt: Your Honor, would that be binding, what was said to Mr. Wallace?

"The Court: It's just evidence. That's all. Just a statement of the defendant against interest. That's all. That's the reason it's competent.

"Mr. Lindsay: Your Honor doesn't hold anything said in this conversation he is relating is any statement by this defendant Wallace against interest surely.

"The Court: That's what he said.

"Mr. Lindsay: He distinctly said Mr. Wallace * * *

"The Court: I am not ruling it was against interest. I am ruling it was what it was worth. I am not ruling whether it's for interest or against interest. That's for the jury to say. The testimony was not objected to by counsel for the defense in the first place."

constituted an invasion of the defendant's right to have the jury decide the facts *only* from the evidence.

Another incident with which we are concerned involves a rather lengthy cross-examination of Wallace by the Court with reference to whether or not he had back-dated the stock certificate stubs discussed under the second overt act.[3] We recognize the right of a federal judge to examine and cross-examine witnesses whenever necessary to bring essential facts to light; but "[w]hen a judge cross-examines a defendant and his witnesses extensively and vigorously, he may present to others an appearance of partisanship and, in the minds of jurors, so identify his high office with the prosecution as to impair the impartiality with which the jury should approach its deliberations." Holmes v. United States, 4 Cir., 1959, 271 F.2d 635, 639. See also Blunt v. United States, 1957, 100 U.S. App.D.C. 266, 244 F.2d 355, 367; United States v. Brandt, 2 Cir., 1952, 196 F.2d 653, 656. The Court's cross-examination in the case at bar highlighted what appeared to be inconsistent and conflicting statements made by Wallace, generally casting the dark shadow of evasiveness around his testimony on this point and creating the impression that the Court may have adroitly and skillfully forced the truth from a fumbling and dodging

3. "Q. Then, consider my question earlier, which you agreed that once a taxpayer takes a course of action, he is bound by it, why did you back-date the stock certificates?

"Mr. Lindsay: Your Honor, just a minute * * *

"The Court: He has a right to ask him why he back-dated them.

"Mr. Lindsay: The trouble is, he is stating about having adopted a course of action * * *

"The Court: The simple question is this: why did you back-date the stock certificates? That's the question * *

"Mr. Lindsay: If he back-dated.

"The Court: If it was back-dated. Or why was it back-dated, if it was back-dated? Answer that question.

"The Witness: I don't recall the stock certificates being back-dated. Well, I do too. I have seen them today. I saw one today. It was back-dated—it was —it bears the date of May 2.

"The Court: You say it was back-dated? Is that right or not?

"The Witness: But I didn't do it.

"The Court: I say, it was back-dated. You said first it wasn't and now you say it was. Which is right?

"The Witness: Let me see the stock certificate book. I'm afraid I'm a little confused here. If Mr. Harmon asked any questions about this stock certificate book, I don't know whether it was * *

"The Court: The question is whether the stock certificate was back-dated or not.

"The Witness: There is one certificate in here for 334 shares, dated May 2, 1949, which was issued by Carling Dinkler and E. M. Turlington to Maurice Puckett. That's Certificate No. 11. I know nothing about that certificate.

"The Court: The question is whether it was back-dated or not.

"The Witness: I don't know that this certificate is back-dated. It could conceivably be or could conceivably not be.

"The Court: Do you know or not?

"Mr. Clay: That's not the one.

"The Court: One minute. Do you know or not whether it was back-dated?

"The Witness: This one?

"Mr. Clay: No, sir.

"The Court: Whether any of them were back-dated. Do you know whether any were?

"The Witness: Here's Certificate No. 12, which is in the book and I have stubs No. 12 and 13 also in the book. I dated those stubs myself on * * *

"The Court: Did you back-date it? That's what we are driving at?

"The Witness: I don't recall that I did.

"The Court: Would you say you did or did not?

"The Witness: I might have done it a few hours—in other words, I might not have done it until May 3 but it was done practically as soon as the transaction occurred because Mr. Puckett intended for that stock to be half in his name and half in his wife's name.

"The Court: Well, do you know whether you back-dated it or not?

"The Witness: Your Honor, that happened in 1949, ten years * * *

"The Court: I asked you the simple question: do you know whether you did or not?

"The Witness: No, sir.

"The Court: He says he doesn't know whether he did or not. Ask him something else."

defendant. Then the Court later instructed the jury that the fact the stock certificates may have been back-dated was immaterial but told the jury also:

"You have a right to take into consideration the demeanor of a witness upon the witness stand, his readiness to answer questions, or his attempt to evade questions or his attempt to argue questions. Consider his entire conduct on the witness stand as to how he impresses you. Does he impress you that he is trying to tell the truth? Does he impress you that he is trying to evade the questions? Does he impress you that he is trying to dodge the questions? Does he impress you that he is trying to argue the case, or does he impress you that he is telling the truth?"

In the leading case of Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, the Supreme Court defined the duties of the United States Attorney:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. * * *"

The record in the instant case discloses a number of statements and comments by the United States Attorney which, contrary to the teachings of the Berger case, were likely to prejudice the defendant in the eyes of the jury.

Under the heading, "Sufficiency of the Evidence", the relevant testimony of Government's witness, Hugh Shearouse, is set forth. On at least six occasions during the trial and in closing argument, the United States Attorney misquoted the language.[4] We cannot agree with the Government that the prejudicial effect of such misquoting was removed by the United States Attorney and the trial judge telling the jurors that it was for them to recall the actual statement. Stewart v. United States, 1957, 101 U.S. App.D.C. 51, 247 F.2d 42, 47. These repeated and seemingly deliberate misquotes, which we believe could have created an impression on the jury that Wallace was cognizant of specific instances of improper charges to the S. H. O. C.

4. An example of such misquoting is found in the closing argument wherein the United States Attorney said:

"Then—now, this is important and I know you gentlemen remember exactly what Mr. Shearouse said. Mr. Shearouse said that he told Braxton C. Wallace in the office of Savannah Hotel Operating Company, 'Mr. Wallace, how do you expect to get away with them?' You remember what he said, 'How do you expect to get away with them?' Keep in mind when he told him that. He told him that in January, 1953. * * * I don't know whether he mentioned the personal items but that's not important. Mr. Shearouse told him about it and Mr. Puckett was right there too. Wallace then turned to Mr. Puckett and he said, 'Shearouse doesn't think we can get away with them.' "

books, may well have become so firmly implanted on the jurors' minds as to cloud the actual testimony. We are of the opinion that the testimony of Mr. Shearouse does not necessarily support the inference attributed to it by the United States Attorney in his distorted version thereof.

In closing argument the United States Attorney made the following statement in speaking of the lease under which Puckett operated the Savannah Hotel in Savannah, Georgia:

"Mr. Watt said that it was a harsh lease or a hard lease, I believe his word was. Mr. Foreman and members of the jury, when you sign a lease, under the law, you read it. And if later it turns out to be hard to your way of thinking, do you then try to cheat the landlord? Let me ask you that question. Do you then try to cheat the landlord? I don't care how hard the lease was."

It will be recalled that the question of the lease arose from the air conditioner transaction in which Wallace advised Puckett to buy the units in his name and regain his investment through rental of these units to guests. We are of the opinion that such statement was improper. Even if there had been evidence that Wallace attempted to "cheat" the landlord, such evidence would have no place in a criminal trial upon the charges contained in the indictment here.

Other prejudicial remarks were made by the United States Attorney near the end of his closing argument and the specific language is set forth in the margin.[5] Such argument was completely improper in that it attempted to impose upon the jury the opinion of the United States Attorney as to the character of

Wallace, and sought to have the jurors draw an unfavorable inference from the failure of Wallace to call as character witnesses his fellow attorneys from the Greenwood, South Carolina, bar. Wallace called, as witnesses, his minister, the Assistant President and Trust Officer of the State Bank & Trust Company in Savannah, Georgia, and a Certified Public Accountant from Columbia, South Carolina, all of whom testified favorably as to his reputation for truth and veracity. He thus put his character and reputation in issue as to the particulars incorporated in the inquiry, subjecting himself to attack by witnesses who might have testified as to a bad reputation. But the prosecution offered no such witnesses nor was it made to appear that such witnesses could have been produced. Comments similar in nature to those of the United States Attorney formed the basis for reversal of convictions in both Ginsberg v. United States, 5 Cir., 1958, 257 F.2d 950, 954, and Steele v. United States, 5 Cir., 1955, 222 F.2d 628, 631. See also the following cases which should serve to constantly remind the United States Attorney of the rule of Berger v. United States, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314, that he must observe scrupulously the rules of law in the discharge of his obligation to be fair to the defendant. United States v. Keenan, 7 Cir., 1959, 267 F.2d 118, 124; Handford v. United States, 5 Cir., 1957, 249 F.2d 295, 298; Stewart v. United States, supra, 247 F.2d at page 48; Hilliard v. United States, 4 Cir., 1941, 121 F.2d 992, 997.

In combination, the incidents, conduct, comments and statements mentioned herein create the definite impression that it is most improbable the defendant has had the fair trial to which he is entitled.

5. "Mr. Watt touched on his reputation. It is normally my policy personally not to cross-examine witnesses or attempt to embarrass any character witness. I want to call your attention to this: I don't know how many lawyers we have in the City of Greenwood. Mr. Wallace is a member of that profession right here. Why didn't we have one of those? Who knows him better than his fellow attorneys? Why didn't he have one of those in here? Think on that, Mr. Foreman and members, from the evidence presented in this case. I don't know what the certified public accountants' organization thinks about him now but as an attorney, frankly, I am ashamed of it. And I mean that sincerely."

The verdict and judgment will be set aside and the case is remanded with the direction that the defendant, Wallace, be accorded a new trial.

Reversed and remanded.

### Addendum

### Compliance with Rules of Court

Rule 10, paragraph 6, of the rules of this court, 28 U.S.C.A. provides:

"Briefs shall not exceed fifty printed pages in length except by special permission of the court; but this limitation shall not apply to the appendices hereinbefore provided for."

Rule 36, promulgated November 20, 1959, is as follows:

"The court reserves the power to take disciplinary action against any party or attorney failing to comply with any provision of the rules of this court."

In this case appellant, in flagrant disregard of Rule 10, filed with the court a printed booklet titled "Brief and Appendix for Appellant," consisting of approximately 200 pages, 22 of which, under the heading "Brief", contained little more than quotations from statutes, and statements of abstract legal principles said to be supported by cases voluminously cited, but without particular comment, discussion or explanation. The remaining pages, under the heading "Appendix", contained, for the most part, detailed statements of specifications of error, a review of evidence and arguments with respect to alleged errors which should logically be presented in the litigant's brief. Thus, by this improper arrangement of brief and appendix material, the members of the court experienced great difficulty in preparing for counsel's oral argument which merely affords the opportunity for elaboration and amplification of the printed brief.

█ Following oral argument, appellant was required to file, within thirty days, a brief not in excess of the maximum length fixed by Rule 10, but the procedure here adopted cannot be relied upon as precedent or as establishing a pattern of disciplinary action under Rule 36. In only rare instances and under the most unusual circumstances should counsel seek permission of the court to exceed the maximum number of pages. The necessity for compliance with all rules of court cannot be overemphasized.