# UNITED STATES of America, Appellee,

v.

# Frederick Robert HINKSON a/k/a "Crazy Fred," Appellant.

## No. 80–5008.

United States Court of Appeals, Fourth Circuit.

Argued July 7, 1980.

Decided Oct. 17, 1980.

E. Lynn Johnson, Fayetteville, N. C. (Blackwell, Thompson, Swaringen, Johnson & Thompson, P.A., Fayetteville, N. C., on brief), for appellant.

Wallace W. Dixon, Asst. U. S. Atty., (George M. Anderson, U. S. Atty. and John M. Owens, Asst. U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before WINTER, BUTZNER, and MURNAGHAN, Circuit Judges.

WINTER, Circuit Judge:

This appeal concerns the admissibility of a third–party confession by a certain Frank Minott ("Stretch") which was proffered through the defense testimony of Teiesa Neal in the homicide prosecution of Frederick Hinkson ("Crazy Fred"). Minott had himself testified before the jury and denied that he had confessed to Neal. The district court ruled the confession inadmissible and Hinkson was found guilty. He appeals and we affirm.

I.

To provide a basis for understanding the context in which the challenged evidentiary question arose and the factors which determine its resolution, we begin with a recitation of the facts:

Defendant was an aspiring member of a motorcycle gang calling themselves the Norsemen. The murder victim was Carl Newman who was defendant's roommate in a trailer off–post of Fort Bragg, North Carolina, and who, according to some of the witnesses, was defendant's lackey, considered by defendant and the members of the gang as a "jerk." It was the government's theory of the killing that defendant sought the position of leader of the Norsemen and decided to kill someone in order to demonstrate his qualifications and potential for that post. Newman was chosen to further defendant's ambition.

On the evening of May 21, 1979, Rick Todd Bieber, John Stone, the defendant, and his girlfriend, Barbara Britt, were assembled in the trailer shared by the defendant and Newman. Bieber and Stone ("Rebel") were the two key government witnesses, and both were hangers–on of the Norsemen. Defendant told his three guests to leave, because the Norsemen were scheduled to convene at the trailer that night. According to defendant, the Norsemen discussed a shoot–out with the Confederates, a

rival gang, which had occurred the preceding Friday night. Bieber and Stone waited at a bar near Fort Bragg and returned to defendant's trailer after the meeting ended.

Bieber and Stone testified that they then returned to the bar with defendant, at which time he told them to come with him for a ride. Their destination was a printing plant at Fort Bragg. Newman, a soldier, was serving guard duty inside the plant that night, along with another soldier. Bieber and Stone testified that the defendant knocked on the door of the plant and that Newman answered. Defendant sent Bieber to the back of the plant to pick up a television. After talking with Newman for a few minutes, defendant cooly raised his .22 caliber pistol and killed Newman by firing three bullets into Newman's head. Bieber, Stone, and defendant then returned to the bar.

As is not unusual with respect to crimes committed in a comparable milieu, the government's star witnesses were not the most upright and sober citizens. Bieber was captured after he was identified by Newman's fellow guard who saw Bieber when Bieber searched the back of the plant for a television. Before trial, Bieber told the police several conflicting stories, including one version in which someone called "Lone Wolf" committed the murder. At trial, Bieber testified that he saw defendant shoot Newman. Bieber insisted that he had lied to the police because he feared that he would suffer reprisals from the Norsemen if he implicated defendant. Bieber conceded that he had used a variety of drugs and that he had been discharged from the army because he was determined to be unsuited for military life.

Stone also had told the police conflicting stories. At first he had contended that he knew nothing about the murder, but eventually he admitted (and testified at trial) that he saw defendant shoot Newman. Stone, like Bieber, stated that he feared the Norsemen would exact revenge if he told the truth. Stone testified against defendant as part of a plea bargain which was arranged after he was charged with misprision of a felony. Stone's credibility came under further attack when he admitted using drugs, conceded that he had attempted suicide by climbing to the top of a building at Fort Bragg, stated that he had been under psychiatric care, and testified that he had once fled a psychiatrist's office in fear of injections with large needles.

Hinkson's defense was grounded on his own testimony and that of another witness. Defendant testified that on the night of the murder Stone borrowed his pistol and left with Bieber. As might be expected, defendant testified that he did not go to the printing plant that night.

Second, the defense interrogated Frank Minott ("Stretch"). Minott, like the defendant, was a member of the Norsemen. He left North Carolina on or about May 22, the day of the murder, toured several states, and arrived in New Hampshire in July. There he began a romance with Jennetta Felt. Minott and Felt slept on the floor of a trailer owned by Jack Neal, a friend of Felt, and Teiesa Neal, Jack's wife. Minott admitted that he carried with him clippings of several shootings, including the murder of Carl Newman. He denied that he had spoken of "unfinished business" in North Carolina. In addition, he denied that he had shot a member of the Confederates during the gang fight on the Friday before Newman's death.

In response to Minott's denials, the defense sought to call Teiesa Neal, the witness whose testimony was ultimately ruled inadmissible by the district court. Outside the presence of the jury Neal testified that Minott had said that he shot Newman with the aid of someone called "Wolf," and that he (Minott) was wanted for murder. According to Neal, Minott showed her clippings of North Carolina shootings on one occasion. She said that he talked about the Norsemen and their activities several times and she thought that he was just bragging when he told her about shooting Newman.

Under cross–examination, Neal confused Newman's murder with the shooting that occurred during the fight between the Confederates and the Norsemen; Neal thought that Newman had been shot in a car and that he had been shot during a fight with the Confederates. She also added that Minott said that he had shot Newman in self defense.

## II.

■ When defendant proffered Neal's testimony, he advanced alternate theories of admissibility. Before us, however, his *sole* contention is that the evidence was admissible under Fed. Evidence Rule 803(24)[1] to prove the truth of the facts that it contains. Accordingly, we will confine ourselves to a consideration of only that rule. As an alternative contention, defendant argues that if not admissible under 803(24), exclusion of the evidence was in violation of *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

As is obvious from its text, 803(24) prescribes a number of conditions which must be satisfied before evidence is admitted under its authority. *See generally*, 4 Weinstein's Evidence ¶ 803(24)[01]. The only condition which concerns us here is the requirement that the evidence have "equivalent circumstantial guarantees for trustworthiness" to the other exceptions to the hearsay rule set out in the rule. Both in oral argument and in their briefs, the parties make no point that the conditions of 803(24) were not met except in the particu-

lar of "equivalent circumstantial guarantees of trustworthiness."

Defendant approaches the question of trustworthiness as if the sole question were the credibility of the witness Neal and to a lesser extent the government follows the same path of error. The trustworthiness requirement or reliability of 803(24), as explained in Weinstein, *supra*, relates to the credibility of the extra–judicial declarant and not that of the witness. The witness appears in court and is subject, not only to the requirements of an oath, but to cross–examination. The demeanor and manner of testifying of the witness can be observed and a determination of credibility made.[2] We turn therefore to the reliability or credibility of Minott who, it is claimed, confessed to shooting the victim.

Regrettably, in excluding Neal's testimony, the district court made no findings with respect to trustworthiness beyond that which can be inferred from the fact that admissibility under 803(24) and the fact that the trustworthiness requirement of 803(24) was satisfied were argued to it and its recitation that admissibility under 803(24) had been considered and was denied. Ordinarily, on such a record we would remand to the district court to make findings so that we could perform our proper function in determining whether the findings were clearly erroneous and whether the district court exceeded the discretion lodged in it under 803(24). We do not remand, however, because we are persuaded that in this record there is lacking a sufficient basis to demonstrate "equivalent circumstantial guarantees of trustworthiness" as the rule requires.

---

1. The pertinent portion of 803(24) is:

    The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

    .  .  .  .  .

    *(24) Other exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence

which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. . . .

2. In this regard, we are constrained to remark that, by reason of the confusion in her recollection of whom Minott confessed to killing, Neal was not entitled to much credibility as a witness unerringly establishing that Minott had confessed to the crime for which defendant was prosecuted.

The only guarantee of trustworthiness is the fact that Minott's alleged statement was self–inculpatory. But we deem that insignificant in view of the other evidence and lack of evidence. Neal testified that Minott gloried in parading his motorcycle gang member image before his girlfriend's acquaintances. A claim that he killed Newman, made to a relatively casual acquaintance hundreds of miles from the scene of the killing, would seem to be braggadocio. There was no physical evidence or testimonial evidence to support either the fact that Minott made the statement or that it represented the truth. Indeed, the testimony of Neal was far less than positive that Minott admitting killing Newman, Minott denied that he made the statement and another eyewitness testified that defendant shot Newman.

### III.

■ We reject defendant's argument that *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) requires reversal of the instant case.

In *Chambers*, as in the instant case, a third party had confessed to the murder for which the defendant was on trial. In *Chambers*, the third party had confessed in writing and in oral statements to several persons, including a minister. Under Mississippi evidence rules, the defendant was permitted to introduce the written confession into evidence and call the third party confessor to the stand. The third party renounced his confession and denied that he committed the crime. Due to Mississippi's voucher rule, the defendant was then unable to impeach the third party by asking him about his oral confessions. Furthermore, under Mississippi's hearsay rules, the defendant was unable to call the persons to whom the third party had confessed. The Supreme Court found that the interaction of these two rules denied Chambers due process, while warning that the rule of *Chambers* was limited to its facts. *See also Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150,

60 L.Ed.2d 738 (1979) (per curiam) (finding unfair trial in death penalty case because defendant was prevented from proving unavailable declarant's confession).

This case differs substantially from *Chambers*. Because the Federal Rules of Evidence abolish the voucher rule, the defendant was able to question Minott at length about his supposed confession, his alleged participation in Newman's murder, his general character, and his reasons for going to New Hampshire. As in *Chambers*, the defendant in this case was unable to call a witness to the stand to prove the oral confession, but the defendant's freedom to cross–examine Minott greatly ameliorated the unfairness of that limitation.

Furthermore, in this case the out–of–court statement lacked substantial guarantees of trustworthiness. In *Chambers*, the Court emphasized that the third party's confessions bore significant indicia of reliability. The confessions were made to close acquaintances shortly after the murder, each was corroborated by other evidence, and each was truly incriminating and against the third party's penal interest. As discussed above, Minott's out–of–court confession had none of those characteristics nor any similar ones. *See United States v. Hughes*, 529 F.2d 838 (5 Cir. 1976) (finding *Chambers* inapplicable because defendant had opportunity to cross–examine his witness and because hearsay statement bore no assurances of trustworthiness).

AFFIRMED.