**UNITED STATES of America, Appellee,**

v.

**Daniel King BRAINARD, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Halton Q. BITTICK, Jr., Appellant.**

**Nos. 80–5079, 81–6912, 80–5080 and 81–6913.**

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1982.

Decided Oct. 7, 1982.

Rehearing and Rehearing En Banc Denied Jan. 13, 1983.

---

John J. Tigue, Jr., New York City (William B. Wachtel, Kostelanetz & Ritholz, New York City, on brief), and Rodney A. Guthrie, Fayetteville, N. C., for appellants.

Allen Holt Gwyn, Jr., Sp. Asst. U. S. Atty., Douglas Cannon, Asst. U. S. Atty., Greensboro, N. C. (Kenneth W. McAllister, U. S. Atty., Greensboro, N. C., on brief), for appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and POTTER,* District Judge.

MURNAGHAN, Circuit Judge: **

Daniel King Brainard and Halton Q. Bittick, Jr. appeal from their convictions on numerous counts related to alleged participation in a fraudulent investment scheme. We reverse and remand for a new trial.

I.

Brainard and Bittick were owners of National Executive Planners, Inc. (NEP), a small investment company located in Greensboro, North Carolina. Brainard had dealt with Sheldon Moss, a Chicago businessman, on several occasions. In July, 1973, Moss telephoned Brainard and proposed that NEP offer to its clients the opportunity to make loans to Moss' company, Television Marketing Corporation (TVM), at an annual interest rate of twelve percent.

Brainard flew to Chicago, where Moss gave him a tour of the TVM facilities and further explained the proposal. Moss claimed that TVM distributed and marketed products sold by national retail stores, and that, because retailers generally paid for merchandise from thirty to ninety days after it was received, TVM experienced a cash flow problem. In order to avoid paying high interest charges to banks for interim financing, Moss suggested, TVM would borrow money from NEP clients, and secure the loans by assignments of accounts receivable from well known national retailers.

---

* The Honorable Robert D. Potter, United States District Judge for the Western District of North Carolina, sitting by designation.

** Part III of the opinion represents the views of Judge Murnaghan alone, and so has only the effect of a concurring opinion. The divergence of the panel members on that point does not affect the outcome of the case.

Brainard discussed the proposal with Bittick and took several measures to investigate TVM. The extent of the investigation is disputed; it is at least clear that Brainard and Bittick obtained a Dun and Bradstreet report, but there is conflicting evidence of the extent to which other information was obtained. In any event, it was decided to offer the opportunity to invest in TVM to NEP clients.

Investment in TVM was popular, and it gradually became a large part of NEP's business. Brainard was active in sales for NEP, and Bittick, although not involved in sales, promoted the investments as well. At the outset investors received the interest payments they had been promised, and were repaid when the loans matured. In addition, most of them received what purported to be Uniform Commercial Code forms verifying the assignments of accounts receivable as security for the loans.

By late 1974, TVM's legitimate marketing activities were curtailed and the company was reduced to a shell through which Moss continued to funnel investors' money. Moss never filed with the Secretary of State the UCC forms he sent to investors, and there were no accounts receivable to secure the loans.

As the scheme progressed, the relations between Moss, Brainard and Bittick developed. In early 1975 NEP experienced financial problems, and Moss lent Brainard and Bittick $13,800. Later that year he contributed another $36,000 to NEP, and in payment for the loans he was given an interest in NEP.

In the interim, Bittick had purchased a controlling interest in Investors Financial Planning, Inc. (IFP), a licensed broker-dealer corporation. Brainard and Moss contributed to Bittick's payments for IFP, and

were beneficial owners of the corporation. In 1976 Bittick traded his interest in NEP for $20,000 plus Brainard's release of his beneficial interest in IFP.[1] NEP salesmen were registered with IFP, and through it sold registered securities.

As a broker-dealer, IFP was required to file reports with the SEC when any change of ownership occurred. In April, 1976, Bittick, as president of IFP, verified SEC form BD and filed it with the SEC to reflect a change of ownership. The form did not list Sheldon Moss as a beneficial owner of IFP, and did not mention that Moss had previously been enjoined from selling unregistered securities.[2]

On September 28, 1978, the Secretary of State of North Carolina issued a cease and desist order directing Moss to stop selling investments in TVM. The SEC and United States Postal Service soon began investigations, and the fraudulent nature of the TVM scheme was revealed. Brainard and Bittick agree that the scheme was fraudulent, but maintain that they, like everyone else, were unwittingly duped by Moss.

Brainard, Bittick, Moss, and Sheldon Rothman, a TVM officer, were indicted on January 28, 1980, on eighteen counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and on one count of making a materially false and misleading statement to the SEC in violation of 15 U.S.C. § 78a et seq. and 18 U.S.C. § 2. Brainard was deleted from Count 19 in a superseding indictment filed on February 25, 1980. Moss pleaded guilty to all charges, and charges against Rothman were dismissed. Brainard and Bittick were tried to a jury and convicted on Counts 3 through 13, 15, and 18; Bittick was also convicted on Count 19. Count 14 was dismissed at the conclusion of the government's case, and Count 16 was dis-

1. The parties disagree as to the time of the transfer; appellants place it on April 1, 1976, while the government argues it was July 6, 1976.

2. Moss had earlier operated a similar investment scheme. He had promised investors in "Golden West Utilities" monthly interest payments at an annual rate of twelve percent, and

had claimed that investments were secured by a second mortgage on undeveloped Arizona land. Brainard marketed Golden West until its collapse in late 1972. On September 27, 1972, Moss, Golden West, and others were enjoined from selling unregistered securities in an action brought by the SEC.

missed while the jury deliberated. The jury returned not guilty verdicts on Counts 1, 2, and 17.[3]

## II.

At the outset we address appellants' contention that the evidence was insufficient to support a guilty verdict on the mail fraud counts,[4] since that contention, if accepted, would require us to enter a judgment of acquittal rather than merely to remand for a new trial.

■ Appellants argue that the evidence did not support an inference that they had the specific intent to defraud necessary for a mail fraud conviction. *E.g., United States v. Pearlstein,* 576 F.2d 531, 537 (3d Cir. 1978); *United States v. Payne,* 474 F.2d 603, 604 (9th Cir. 1973). Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), *United States v. Bobo,* 477 F.2d 974, 989 (4th Cir. 1973), *cert. denied,* 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975), we find that the evidence was sufficient to support an inference that Brainard and Bittick had the requisite intent to defraud.

Several elements of the scheme were sufficiently obvious to support an inference that Brainard and Bittick knew it was fraudulent. The UCC forms provided to investors were xeroxed copies which bore no evidence of filing or recordation, no signature of the secured party, and often no signature of the debtor. Although accounts receivable were ostensibly paid to TVM by Sears within 180 days, victims received only one UCC form, even if their investments lasted three or more years. When investors complained that they had not received their UCC forms the delivery dates were changed, and in some instances no date was promised, at Brainard's direction. Some investors who wanted their money back were repaid in piecemeal fashion.

Additionally, there was testimony that appellants, in describing TVM to potential investors, embellished their description of Brainard's investigation of the firm. They falsely assured NEP salesmen that a review of Moss' finances showed he had a substantial net worth. An inconclusive Dun and Bradstreet report was described by appellants as showing TVM's creditworthiness.

Finally, Moss' other dealings with appellants could have provided further support for an inference that they intended to defraud investors. When NEP had financial difficulties, Moss provided $49,800 to maintain the company, and in return acquired a financial interest in it. Brainard had previously sold unregistered Golden West Securities marketed by Moss as part of a similar scheme.

The aggregation of circumstantial evidence offered by the government was sufficient to permit a finding that Brainard and Bittick knowingly participated in the fraud. Accordingly, we proceed to appellants' other allegations.[5]

---

**3.** Both defendants received concurrent sentences of five years on Counts 3, 4, 5, and 6, and two years, concurrent, on the remaining mail fraud counts. Bittick also received a concurrent three year sentence and a $10,000 fine on Count 19, and a $2,000 fine on the mail fraud counts.

**4.** The argument is made only by Brainard in his brief, but Bittick adopts all arguments raised by Brainard insofar as they are relevant to him. F.R.App.P. 28(i). Since the facts which incriminate the two appellants are so similar, we assume that Bittick properly raised the question of the sufficiency of the evidence.

**5.** Bittick asserts that there is a fatal variance between the indictment and the evidence with respect to Count 19. The contention actually addresses the sufficiency of the evidence. He argues that the evidence showed that Moss had no power to control IFP after March 31, 1976, and that, since buying stock is not financing, Moss did not finance IFP. Thus, he concludes, he was not required to list Moss on Form BD as a person who exercised a controlling influence over the applicant's management or who financed the business, or to disclose the prior injunction.

There was ample evidence to support the opposite conclusion. There was evidence that Moss did not surrender his interest in IFP until July of 1976, and thus had the power to control the company on April 20, 1976, when the form was filed. There was also testimony that loans for stock purchases constitute financing. The

### III.

In his closing argument the Assistant United States Attorney stated that Bittick had told Brainard, in essence, that TVM was "a downright fraud" and "a hairbrain scheme," that "there is something fraudulent here" and "something wrong here," and that "this thing stinks." Bittick's actual statements were "that normally the higher the return, the higher the risk," and that until he knew more about TVM he would not recommend it to his clients. Appellants contend that the government's misquotations were prejudicial.

The closing arguments of counsel are "limited to the facts in evidence and reasonable inferences flowing therefrom." *United States v. Ojala,* 544 F.2d 940, 946 (8th Cir. 1976). *See also, e.g., United States v. Bell,* 506 F.2d 207, 225–26 (D.C.Cir.1974). Here, the prosecutor went well beyond arguing which inferences were reasonable. Instead, he went so far as to attribute to Bittick on five occasions unequivocal inculpatory statements with respect to the only disputed issue in the case. Particularly in a case where the evidence is voluminous and the facts complex, we cannot excuse such prosecutorial distortion. The misquotations "may well have become so firmly implanted on the jurors' minds as to cloud the actual testimony." *Wallace v. United States,* 281 F.2d 656, 668 (4th Cir. 1960) (misquotation of government witness). *See also United States v. Guajardo-Melendez,* 401 F.2d 35, 40 (7th Cir. 1968) (where the prosecutor attributed to a government witness testimony which inculpated the defendant, and the government witness had not so testified, a new trial was required).

*United States v. Callanan,* 450 F.2d 145, 151 (4th Cir. 1971), relied on by the dissent, supports our conclusion. In that tax evasion prosecution, the government improperly described deductions taken by the defendant as illegal. The court relied on three factors in finding that the prosecutor's remarks were not prejudicial: the evidence was overwhelming, the comments did not pertain to a central issue in the case, and the prosecutor as well as the court made clear to the jury that the defendant was not charged with false deductions. Here, none of those factors is present. On the question of knowledge, the case was a close one. The only direct evidence—the defendants' testimony and hearsay statements by Moss—indicated that Brainard and Bittick did not know of the fraudulent nature of the scheme. The circumstantial evidence relied on by the government was sufficient to support a finding of knowledge, but did not compel such a finding. The misstatements pertained to the central issue—indeed the only issue—in the case. Finally, the court's general instruction, echoed by the prosecutor, that the jury should rely on its own recollection of the evidence fell far short of the specific admonition in *Callanan* that the comments with respect to the deductions were improper. At no time was the jury instructed to disregard the repeated misquotations of Bittick. *Cf. United States v. Guajardo-Melendez, supra* (misquotation of witness in closing argument was prejudicial notwithstanding the court's instruction on four occasions that the jury should trust their own recollection rather than that of counsel).[6]

Defense counsel failed to object to the prosecution's remarks.[7] Nevertheless,

---

evidence was sufficient to support Bittick's conviction on Count 19.

**6.** The prosecutor's statement to the jury that "I don't mean to say that's what Mr. Bittick said and put it in quotes" is insufficient to justify the misquotations. Even if the jury heeded that initial disclaimer, it was never told that the prosecutor was not quoting Bittick when, twenty-one pages later in the transcript, the prosecutor attributed to Bittick "this thing stinks," and still later, "that's a hairbrain scheme" and "it's a downright fraud." A single disclaimer

does not give the prosecutor license to distort the defendant's testimony with respect to the central issue on four subsequent occasions.

**7.** After the summation, defense counsel moved for a mistrial, citing, *inter alia,* the government's misquotations. A motion for a mistrial after the summation is not, however, a substitute for an objection at the time the prejudicial comments are made. *United States v. Elmore,* 423 F.2d 775, 780–81 (4th Cir. 1970), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970).

an appellate court can "in 'exceptional circumstances' notice intemperate remarks if they were 'devious, or if they otherwise seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings.'" *United States v. Elmore, supra,* 423 F.2d at 781. It is difficult to imagine comments which would more seriously affect the fairness of a trial than repeated misquotations of the defendants with respect to the only disputed issue.[8] The remarks constitute plain error. F.R. Crim.P. 52(b).

## IV.

■ At trial, the government elicited from a number of witnesses statements made by Sheldon Moss which were arguably inculpatory of Brainard and Bittick. However, on cross-examination of Karen Gambala, a former secretary to Moss, defense counsel were instructed "not to ask her about the matter of Mr. Moss' statement to the effect that the Defendants are innocent." Ms. Gambala's proffered testimony that Moss had told her that "Hal Bittick and King Brainard had no knowledge of [the scheme]" was excluded from evidence.[9] Appellants contend that Moss' exculpatory statements were admissible under the hearsay rules, and alternatively, that the Confrontation Clause required that they be admitted. Since we agree with their first contention, we do not address the second.

The threshold inquiry under the hearsay rules is whether Moss was "unavailable." F.R.Evid. 804(a)(1) provides that a witness who is "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement" is unavailable. Here Moss never actually took the stand and claimed his Fifth Amendment privilege against self-incrimination, so the district court never had occasion to rule formally on the matter. However, Moss' attorney stated in court that if Moss were subpoenaed, "I will advise him and he will accept my advice to claim the privilege of the Fifth Amendment," and the district court agreed that the assertion of the privilege would be valid.

We decline to require the defense actually to produce Moss and obtain a formal ruling on his assertion of the privilege under those circumstances. Brainard, Bittick, and their counsel could properly proceed on the basis that, in light of the statement by Moss' attorney, he would plead the privilege against self-incrimination, and that the district judge, in view of what he had said, would rule in favor of the privilege claim.[10] "It would be mere formalism to abjure the merits of [Moss'] claim." *United States v. Thomas,* 571 F.2d 285, 288 (5th Cir. 1978) (where a witness did not take the stand, relying on his claim of the Fifth Amendment privilege, he was unavailable for the purposes of F.R.Evid. 804(a)(1) although the court had never ruled on the assertion of the privilege). *See also Lowery v. Maryland,* 401 F.Supp. 604, 606 (D.Md.1975), *aff'd,* 532 F.2d 750 (4th Cir. 1976) (unpublished opinion), *cert. denied,* 429 U.S. 919, 97 S.Ct. 312, 50 L.Ed.2d 285 (1976) (where a witness' attorney has indicated that he will assert the Fifth Amendment privilege if called, and the claim of privilege would have merit, the witness is unavailable de-

---

**8.** Although the prosecutor only misquoted Bittick, the remarks prejudiced Brainard as well, since he was the supposed listener, and, had the statements actually been made, he would have been alerted to the possibility of fraud.

**9.** Ms. Gambala also stated in her proffered testimony that "Mr. Moss had told me repeatedly that since the indictment of all of the Defendants that [sic] all of the Defendants are innocent, that they did not have any knowledge of what actually was going on."

**10.** The government does not argue that the district court erred with respect to the merits of Moss' assertion of the privilege, and therefore we do not reach the issue here. We do note in passing, however, that although Moss had pleaded guilty and therefore waived the privilege with respect to the substantive offenses, *e.g., United States v. Yurasovich,* 580 F.2d 1212, 1217–18 (3d Cir. 1978), his testimony may have tended to incriminate him with respect to conspiracy, tax evasion and other offenses.

spite the absence of a formal ruling).[11] The attorney's representation that Moss would claim the privilege, and the district court's statement that the privilege would be available, suffice to constitute Moss an "unavailable witness." [12]

We proceed to consider whether, in view of Moss' unavailability, his utterances were admissible as statements against interest under F.R.Evid. 804(b)(3). Our initial inquiry is whether the statements were against Moss' interest within the meaning of the rule. The statements amounted to an admission that the scheme which he organized was fraudulent. While Brainard and Bittick's ignorance of the fraud does not in itself incriminate Moss, his representation that they were unaware of the fraud strengthened the impression that he had an insider's knowledge of the scheme, that it had elements of a shady nature, and that, based on his special familiarity, he knew that Brainard and Bittick were not contributing those elements. The rule does not "constrict the scope of a declaration against interest to the point of excluding collateral material that, as here, actually tended to fortify the statement's disserving aspects." *United States v. Barrett*, 539 F.2d 244, 252 (1st Cir. 1976) (holding that the declarant's statement that the defendant was not involved in a theft was a statement against interest). *See also United States v. Thomas, supra*, 571 F.2d at 288–89 (statement that the defendant "didn't have anything to do with it" was a statement against inter-

est). We therefore conclude that "a reasonable man in [Moss'] position would not have made the statement unless he believed it to be true." F.R.Evid. 804(b)(3).[13]

Since the statements were against Moss' interest, they were admissible if "corroborating circumstances clearly indicate the trustworthiness of the statement[s]." F.R. Evid. 804(b)(3). *See also United States v. Thomas, supra*, 571 F.2d at 290; *United States v. Barrett, supra*, 539 F.2d at 253. We note first that the government's argument, echoed by the dissent, to the effect that Moss was not a credible witness ignores the central issue. The requirement of corroborating circumstances was designed to protect against the possibility that a statement would be fabricated to exculpate the accused. Thus, the Advisory Committee explained the requirement of corroborating circumstances as follows:

> [O]ne senses in the decisions a distrust of evidence of confessions by third persons offered to exculpate the accused arising from suspicions of fabrication either of the fact of the making of the confession or in its contents, enhanced in either instance by the required unavailability of the declarant.

F.R.Evid. 804(b)(3), Advisory Committee Notes. The rule requires not a determination that the declarant is credible, but a finding that the circumstances clearly indicate that the statement was not fabricated. It is the statement rather than the declarant which must be trustworthy. *Cf. United*

---

**11.** *United States v. Klauber*, 611 F.2d 512, 514 (4th Cir. 1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980), relied on by the government, is inapposite. There the witness' attorney had not appeared in court, but had merely represented to defense counsel that he would refuse to testify. Moreover, the district court had not passed on the validity of the prospective claim of privilege. Finally, the issue there was not whether the witness was unavailable, but whether the district court had erred in declining to grant immunity to another witness.

**12.** Of course, the district judge should have required the witness to appear and assert the privilege, and should have ruled formally on the matter before evaluating his availability. We simply hold that in the present circum-

stances, where the *district judge* had in effect excused the defendant from obtaining a formal assertion of the privilege, the defendant is not foreclosed by the failure to comply with the strict requirements of the rule. *See United States v. MacCloskey*, 682 F.2d 468 (4th Cir. 1982).

**13.** The dissent contends that Moss' statements were *not against his interest, since by exculpat*ing Brainard and Bittick, Moss might have forestalled a conspiracy prosecution against himself. However, even without Brainard and Bittick, the government had no shortage of coconspirators. For instance, Sheldon Rothman, a TVM officer, was a more likely coconspirator than Brainard or Bittick, since he, like Moss, was involved in TVM itself.

*States v. Atkins,* 558 F.2d 133, 135–36 (3d Cir. 1977), *cert. denied,* 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 289 (1977) (exclusion of statement against interest, based on lack of credibility of the witness and declarant, was error where circumstances corroborated the statement).

The circumstances surrounding Moss' statements provide the required corroboration. Moss had not yet pleaded guilty, and his statements acknowledging the existence of a scheme tended to inculpate him. There was no apparent reason for Moss to lie to his secretary, since he had no knowledge that his statements would ever be used on behalf of Brainard and Bittick. The statements were made by Moss on a number of occasions. The circumstances clearly indicate that the statements were not fabricated. They should therefore have been admitted by the district court.[14]

The government's successful attempt to exclude Moss' exculpatory hearsay statements but at the same time introduce his inculpatory statements is of particular concern to us. The inculpatory statements could not, under the Sixth Amendment's Confrontation Clause, be used against appellants unless Moss was unavailable and the statements bore adequate indicia of reliability. *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). Yet the government now contends that Moss was available, and that his exculpatory statements were unreliable. The government's attempt to have it both ways strikes us as imprudent and unfair. Were we to accept the contention that Moss was available and his exculpatory statements unreliable, then, absent a showing that his inculpatory statements were for some reason more reliable, their use at trial would pose serious constitutional problems.

We conclude that Moss was unavailable, and that his statements were against his penal interest and surrounded by corroborating circumstances. The statements went to the heart of the defense—the contention that Brainard and Bittick did not know of the fraud. The jury should have been permitted to hear testimony with respect to Moss' statements.[15]

### V.

Appellants raise a number of other issues. In light of our determination that a new trial is required, we decline to address matters which may not arise at a new trial, or may arise under significantly different circumstances. There are, however, two additional points which require our present consideration.

### A.

On November 2, 1978, Lilian Wilcox, an SEC employee, began a "routine" non-criminal investigation at NEP offices. Her investigation lasted until November 9; she gathered information and documents with respect to TVM and other matters. On November 9 she was informed by J. Larry Grant, Assistant Regional Administrator in the Atlanta Enforcement Division of the SEC, of a criminal investigation of NEP being conducted by Mike Gulas, a postal inspector. Grant directed her to disclose any pertinent information to Gulas. She provided Gulas with the information she

14. Had the statements been admitted, the government would have been free to argue to the jury that they were not credible. The requisite corroborating circumstances need not be sufficient to remove all doubt with respect to the hearsay statement. The rule requires only that "corroborating circumstances clearly indicate the trustworthiness of the statement." F.R.Evid. 804(b)(3).

15. The government's contention that Moss' statements were expressions of his opinion, and were not admissible even if within a hearsay exception, is without merit. The district court correctly noted that Moss, if he were present, could not simply testify that Brainard and Bittick were innocent, their innocence being a question for the jury, but that he could testify with respect to their knowledge of the scheme. Moss' hearsay statement that defendants had no knowledge of the scheme or its details should properly be construed, for purposes of admissibility at least, to mean that Moss had not told them about the scheme, a statement within his competence, and that he was in a position to afford factual testimony supportive of the conclusion favorable to Brainard and Bittick.

had obtained, and then returned to NEP and picked up a list of NEP clients and employees, which she also brought to Gulas.

The district court ruled that the list itself was improperly obtained, and therefore inadmissible, since once Ms. Wilcox knew of the criminal investigation she was obliged to warn Brainard of his constitutional rights. The court also found that since the information in the list had been independently obtained elsewhere, it did not taint the rest of the government's case. Brainard challenges the second finding, and also argues that Wilcox's disclosure of the information to a postal inspector violated the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 et seq.,[16] which required her to obtain Commission approval prior to disclosure. Since that position, if accepted, would eviscerate the government's case, we address it now.

The court's ruling that the information in the list had been independently obtained elsewhere was not clearly erroneous. A week before Gulas and Wilcox met, Gulas had served on NEP a grand jury subpoena which required production of NEP and TVM personnel records, as well as other documents. The subpoenaed materials constitute the required independent source of the information in the list. E.g., Brewer v. Williams, 430 U.S. 387, 406 n.12, 97 S.Ct. 1232, 1243 n.12, 51 L.Ed.2d 424 (1977); McLindon v. United States, 329 F.2d 238, 240 (D.C.Cir.1964).

■ Nor do we find merit in Brainard's claim that Wilcox's disclosure of the information violated the Investment Advisors Act of 1940. The Commission can delegate its power to approve the disclosure of information to other governmental authorities, 17 C.F.R. § 203.2,[17] and it had authorized Grant to permit disclosure of information gathered in informal investigations. Wilcox had the requisite approval of the Commission, through its delegate, Larry Grant.

### B.

■ Bittick argues that the district court erred in refusing to sever Count 19 from the mail fraud counts. He contends that Count 19 was unrelated to the other counts, and that the evidence introduced for Count 19, which established a connection between Bittick and Moss, was prejudicial. We disagree.

Two or more offenses may be charged in the same indictment if based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan." F.R.Crim.P. 8(a). The false statement alleged in Count 19 was made by Bittick in his capacity as controlling shareholder of IFP. Brainard and Moss also had an interest in IFP, and Brainard, Bittick, and NEP's salesmen were registered as representatives for the sale of securities with the SEC through IFP. Since NEP was not a broker-dealer, it relied on IFP to sell registered securities. The false statements alleged in Count 19 were, under the government's theory, intended to prevent the SEC from discovering Moss'

---

16. 15 U.S.C. § 80b–10(b) provides in part:

[T]he Commission, or any member, officer, or employee thereof, shall not make public the fact that any examination or investigation under this subchapter is being conducted, or the results of or any facts ascertained during any such examination or investigation; and no member, officer, or employee of the Commission shall disclose to any person other than a member, officer, or employee of the Commission any information obtained as a result of any such examination or investigation except with the approval of the Commission.

17. Information or documents obtained by the Commission in the course of any investigation or examination, unless made a matter of public record, shall be deemed non-public, but the Commission approves the practice whereby officials of the Division of Enforcement at the level of Assistant Director or higher, and officials in Regional Offices at the level of Assistant Regional Administrator or higher, may engage in, and may authorize members of the Commission's staff to engage in, discussions with representatives of domestic or foreign governmental authorities and self-regulatory organizations concerning information obtained in individual investigations, including examinations and formal investigations conducted pursuant to Commission order.

17 C.F.R. § 203.2.

involvement in IFP and NEP, in order to protect the fraudulent scheme. That relation satisfied the requirements of Rule 8(a). *Cf. United States v. Jamar,* 561 F.2d 1103, 1105–06 (4th Cir. 1977) (perjury charge was properly joined with charges of unlawful possession and uttering of a stolen United States treasury check, where the perjury occurred in a preliminary hearing on the possession and uttering charges).

Of course, although joinder was proper, severance would have been permitted if any defendant would have been prejudiced by a joint trial. F.R.Crim.P. 14. That decision is committed to the district court's discretion. *United States v. Foutz,* 540 F.2d 733, 736 (4th Cir. 1976). We find no abuse of discretion here, since the concealment charged in Count 19 would in any event have been admissible in a separate mail fraud prosecution to show intent to defraud. *Cf. United States v. Grow,* 394 F.2d 182, 196 (4th Cir. 1968), *cert. denied,* 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968) (evidence of concealment of ownership was admitted in mail fraud prosecution).

Since appellants' trial was deficient in important respects, we reverse and remand for a new trial.

REVERSED.

WIDENER, Circuit Judge, concurring and dissenting:

I concur in parts I, II, and V of Judge Murnaghan's opinion. I also concur in part IV and thus favor remand for a new trial, but I would add that, left to my own devices, I would reach the same result by a more direct route which does not depend upon an abuse of discretion. I dissent from part III.

█ Part III of the opinion concerns statements by the United States Attorneys made as part of their closing arguments. I would obtain the same result as Judge Potter in part II of his separate opinion. While I do not necessarily disagree with Judge Potter, I reach this decision for different reasons.

During the two prosecution summations, Brainard's attorney made four objections, three of which were sustained. In two instances, the court gave curative instructions. Brainard's attorney did not move for a mistrial at the time of any of these objections, corrected by instruction or not. It was only at the conclusion of both summations and after the jury had been excused that the motion for mistrial was made. Absent particularly egregious circumstances, counsel cannot sit silently through a summation, and then move for a mistrial, claiming that there were prejudicial remarks. *United States v. Polytarides,* 584 F.2d 1350, 1354 (4th Cir. 1978); *United States v. Elmore,* 423 F.2d 775, 780–81 (4th Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970). Here, the facts are even stronger against awarding a mistrial. The judge gave curative instructions on account of two of the objections. It is patently unfair for defense counsel to allow the closing argument to proceed under the supposition that curative instructions were sufficient, and then claim, at the end of the argument, that such instructions are not sufficient and that a mistrial is necessary.

With respect to part IV of Judge Murnaghan's opinion, I concur in his opinion and agree that it was improper to prohibit introduction of Moss' statements to his secretary and that this was reversible error. Nevertheless, I think there is another and more compelling basis for finding it improper.

The government elicited testimony consisting of statements made by Sheldon Moss which were inculpatory of Brainard and Bittick. This was, of course, as the panel opinion points out, hearsay testimony. Nevertheless, testimony by Moss' former secretary as to statements made by Moss which were exculpatory of Brainard and Bittick was excluded. In attacking hearsay testimony, Rule 806 of the Federal Rules of Evidence provides, in part:

When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence that would be admissible for the purposes if declarant had testified as a witness. Evidence of a statement or con-

duct by the declarant at any time, inconsistent with the hearsay statement, is not subject to any requirement that he may be afforded an opportunity to deny or explain.

The basis for this rule is obvious. As the Federal Rules of Evidence Advisory Committee said: "The declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified. See Rules 608 and 609." By introducing the hearsay statements made by Moss, the prosecution put Moss' credibility in issue. Prior inconsistent statements are a well recognized means of impeaching a witness. FRE Rule 613.[1] The secretary's testimony, which would have included conversations showing Moss had stated that Brainard and Bittick did not know the true nature of TVM, would have been such an inconsistent statement. As such, it would have been admissible under Rule 806, and failure to admit it was reversible error.[2]

POTTER, District Judge *, dissenting.

I respectfully dissent from Part Four of the majority's opinion and disagree with Judge Murnaghan's concurring position stated in Part Three of his opinion.

The majority has reversed the convictions on the grounds that the trial court wrongfully excluded certain exculpatory statements made by a third co-defendant, to the prejudice of defendants, Brainard and Bittick. Because I believe that this claim does not amount to reversible error, and in any event, find that the record reflects substantial evidence of guilt in this matter so as to overcome any undue prejudice, I would affirm the convictions.

### I.

This case involved a very complex and intricate scheme of investment fraud and consumed four weeks of trial. Initiated by Sheldon Moss, the fraud was one of substantial financial dimensions whereby some one thousand citizens of North Carolina were convinced to invest four and a half million dollars in a sham investment known as a "Ponzi scheme." As a result of this scheme, Brainard and Bittick's brokerage firm, NEP, received over $550,000 in commissions. Although Sheldon Moss pleaded guilty, Brainard and Bittick raised the defense that they were duped by Moss just as the investors had been, and that they were not knowing or willful participants in the fraud.

It was this defense of good faith ignorance of the fraud that the government repeatedly challenged, and I believe, eventually destroyed by the substantial incriminating evidence presented at trial. First of all, the TVM investment was not an obscure item, hidden from inspection among NEP's other investments; rather, TVM was NEP's star offering. The commissions from the sale of TVM accounted for approximately 45% of NEP's income during the years it was sold, and no other offering produced even half as much income to NEP. Yet, oddly enough, TVM had no prospectus, no financial statement, no annual report, or any other written financial information of any sort. Inquiring junior salesmen of NEP were told by Brainard and Bittick simply that they had "checked things out."

The evidence further established that Brainard and Bittick were thoroughly ac-

---

**1.** FRE Rule 613 concerns prior inconsistent statements by a witness who is testifying. Rule 806 recognizes that inconsistent out-of-court statements could have been made either prior to or subsequent to the hearsay statement originally offered as evidence and thus it allows introduction of "a statement or conduct by the declarant at any time." *See* Advisory Committee Note to Rule 806.

**2.** The government also contends that the statements by Moss to others tending to show the guilt of Brainard and Bittick were admissible as

the statements of a co-conspirator. Thus they would not be hearsay. FRE 801(d)(2)(E). Even assuming they were the statements of a co-conspirator, the result would be the same, for FRE 806 specifically provides for the impeachment by inconsistent statement of a statement admitted into evidence under FRE 801(d)(2)(E).

\* Robert D. Potter, United States District Court Judge for the Western District of North Carolina sitting by designation.

quainted with Sheldon Moss and were on quite intimate business relations with him. Both defendants knew that Moss had previously been the target of criminal investigation for his investment schemes and had previously been enjoined by the S.E.C. from selling securities. When NEP had financial problems of its own, Moss arranged to have some $49,000 transferred to NEP. As a result of these transfers, Brainard and Bittick were relieved of a $13,800 debt to NEP, and Sheldon Moss ended up owning 30% of the stock of NEP. From such direct payments of money to them by Moss, and from their sizeable commissions on the sale of TVM stock, Brainard and Bittick profited substantially from their various business dealings with Moss.

Part of the sales scheme designed to boost the credibility of TVM as an attractive investment were the repeated representations made by Brainard and Bittick that Sears, Roebuck Co. was backing the commercial paper. Brainard acknowledged at trial that he had no direct proof of Sears' backing of TVM, yet investors who also testified at trial stated that Brainard and Bittick personally assured them that the investment was safe, it was backed by Sears, and that they had checked things out. With regard to his specific representation on one occasion that Sears had purchased ten million cases of a product through TVM, a totally false statement, Brainard, at trial, could only offer the response that "I am sure that I have erred in some of my verbiage." (Tr. at 3172). Brainard also had repeatedly stated to his salesmen that the TVM investment had been registered with, or otherwise approved by, the State of Illinois. This statement was also untrue and would have been discovered to be so had Brainard really "checked things out."

Perhaps the most blatant examples of Brainard's misrepresentations were revealed in the testimony of Merlene Burzell and Robert Staub. Having already lost money on a questionable Florida land purchase deal set up by Bittick, Ms. Burzell was determined to make sure an investment in TVM would be safe. On the evening of the same day that he received a cease and desist order from the Securities and Exchange Commission on the sale of TVM, Brainard went to Ms. Burzell's home and persuaded her to invest $30,000 of her husband's retirement pension fund in TVM. As Ms. Burzell testified, although she was wary of the TVM investment, Brainard assured her that the investment was safe, it was backed by Sears, he had run a Dun & Bradstreet check on Sears[1], and that her investment was guaranteed.

Robert Staub, an investment broker in Fayetteville, North Carolina, testified that he had been contacted by Brainard and Bittick to sell the TVM investment in his area. After being told by Brainard that the state of Illinois had approved the sale of TVM and had issued a certificate to TVM, totally false statements, Mr. Staub agreed to sell some of the stock to his investors. However, in July of 1976, when he attempted to get an $18,000 investment returned to one of his buyers, he encountered repeated difficulties and excuses from Brainard and Moss. Eventually, the money was returned in installments over six or seven months. Because of this incident and other problems, Staub informed Brainard that he would no longer handle TVM investments. He further stated to Brainard that "something had to be wrong" with TVM when it was taking in so much money and yet had difficulty returning investments in single lump sums. (Tr. at 740).

For all their bravado and confidence in representing TVM to the investors and junior salesmen as a safe investment which they had thoroughly checked out, it is grimly ironic that Brainard and Bittick, having been enriched by more than half a million dollars in commissions on the TVM sales, eventually claimed total ignorance of the true nature of TVM: a non-existent company, the investments in which went directly into the pockets of Sheldon Moss. After a

1. Brainard did not reveal to Ms. Burzell whether or not a Dun and Bradstreet had been performed on TVM, the very company the security of which she was concerned about.

**1130**

careful review of the entire record of the trial below, it is clear that there was substantial evidence to support the jury's determination of guilt on the crimes charged. In my opinion, the substantial evidence of guilt was sufficient to overcome any prejudice which may have resulted from the assignments of errors discussed below.

## II.

■ In Part Three of his opinion, Judge Murnaghan offers the concurring opinion that misquotations of Bittick's testimony made by the prosecutor in his closing argument prejudiced the defendants. While I agree that the prosecutor may have been somewhat overzealous in his argument to the jury, I do not believe his indiscretion prejudiced the defendants' case so as to require a new trial.

A reading of the statements in question as they appear in the full context in which they were made indicates that the prosecutor did not in fact specifically put words into the mouth of defendant Bittick or otherwise attribute specific testimony to him.[2] Rather, the prosecutor, in an effort to show what the defendants knew or should have known, characterized the words of Bittick in a way designed to emphasize how unreasonable it was for Brainard to remain ignorant of the fraud. The prosecutor's characterization was more an argument as to the reasonableness of the defendants' claim of ignorance than an attempt to insert admissions or testimony otherwise not in evidence. From the context in which these statements were made, I find that a jury would have viewed them as argument, and would not have attributed the remarks to Bittick.

Judge Murnaghan's concurrence in Part Three of his opinion cites *Wallace v. United States,* 281 F.2d 656 (4th Cir. 1960), and *United States v. Guajardo-Melendez,* 401 F.2d 35 (7th Cir. 1968), as supportive of his holding.[3] In my view, these cases involved far more egregious conduct on the part of the prosecution than that which occurred in the present case. Furthermore, since *Wallace* and *Guajardo-Melendez,* this Court has adopted the standard of the District of Columbia in determining the prejudicial effect of improper statements made by the prosecution. That standard was articulated in *United States v. Callanan,* 450 F.2d 145, 151 (4th Cir. 1971) as follows:

---

2. The portions of the prosecutor's closing argument in question are set out below:

"In other words, if we are to believe Mr. Bittick, he was telling King right then and there on King's return back from Chicago, 'something ain't right about what we got there. The description you're giving me of that product is not accurate. There is something fraudulent there. You've got the pitch wrong. There's something wrong there.' I personally, and, of course I don't mean to say that's what Mr. Bittick said and put it in quotes. You recall what he said and did not say, but I believe you will recall something to the effect that 'I won't recommend that to any of my customers.' (Tr. at 3577)

"With respect to Mr. Bittick, according to his testimony, he told Mr. Brainard that this thing stinks in 1973, and he never did anything about it. (Tr. at 3598)

"I suggest to you that what happened with Mr. Bittick in 1973, his company was not in good straits. It may make it; it may not. They need that competitive edge. Mr. Brainard goes up to Chicago and comes back down, and Mr. Bittick hears about this and says either (A) that's a hairbrain scheme, or (B) it's a downright fraud, but they needed a product such as Television

Marketing. It may [be] able to float for a while, who knows? Maybe these products will take off. He lets his company get involved, but I suggest to you that the evidence is fair to say that he thought things probably were pretty risky there..." (Tr. at 3601–02)

3. In *Guajardo-Melendez,* the court found that the improper statements of the prosecutor amounted to " 'testimony' of an alleged hearsay statement" which denied the defendants their Sixth Amendment right of confrontation, an error that could not be cured by jury instructions. 401 F.2d at 40.

In *Wallace,* the United States Attorney on six occasions during trial and in his closing argument misquoted the testimony of a government witness. It was this series of "repeated and seemingly deliberate misquotes" which the court found to be prejudicial. Additionally, the prosecutor improperly argued his own impression of the character of the defendant and sought to have the jurors draw an unfavorable inference from Wallace's failure to call as character witnesses fellow attorneys from his community. 281 F.2d at 667–68.

Whether the untoward remarks prejudiced [the defendant] must be tested by "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *quoting, Gaither v. United States, . . .* 413 F.2d 1061, 1079 (D.C.Cir. 1969).

In the present case, the statements in question may have touched directly on the issue of the defendant's knowledge of the fraud, but they were not the only evidence of the defendants' guilt. Since the record reveals substantial other evidence of the defendants' guilty knowledge, I consider this case not to be a close one within the meaning of the *Callanan* standard. Furthermore, it is significant that the statements were not explicitly attributed to Bittick, but were couched in argumentative terms as to the effect that his words should have had on Brainard. In this situation, the prosecutor's cautionary statement that the jury should recall the testimony from their own memory and not rely on his representations, buttressed by the Court's instructions that the arguments were not evidence and that the jury was to rely on its own recollection of the evidence and testimony, were more than sufficient measures to mitigate the effects of any improper statements.[4]

In considering this claim of prejudice arising from prosecutorial statements, it is helpful to note the words of the Supreme Court as set forth in *United States v. Socony-Vacumn Oil Co.,* 310 U.S. 150, 239–40, 60 S.Ct. 811, 851–52, 84 L.Ed. 1129, *as cited in, United States v. Elmore,* 423 F.2d 775, 781 (4th Cir.), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970):

> [E]ach case necessarily turns on its own facts. And where . . . the record convinces us that these statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by passion and prejudice, reversal would not promote the ends of justice.

Similarly, in the present case, the challenged statements of the prosecutor were but a small portion of his argument, and assessing these statements in the context of the prosecutor's total argument and the evidence accumulated in the course of the four-week trial, there is no reason to believe that the statements so misled the jury as to deprive the defendants of their right to a fair trial.[5] Consequently, in light of the isolated nature and the character of the remarks, the context in which they were made, the cautionary and mitigating statements of the prosecutor, defense counsel, and the court, and in light of the substantial other evidence of the defendant's guilty knowledge of the fraud, I would find, based upon the standard enunciated in the *Callanan* decision, that the prosecutor's argument to the jury did not prejudice the defendants so as to require a new trial.[6]

---

**4.** Even defense counsel partially mitigated any harmful effects of the prosecutor's remarks by stating in his own closing argument that the prosecutor's statements were only a characterization, and that Bittick's actual words were not "Television Marketing stinks." (Tr. at 3687)

**5.** *See also United States v. Harris,* 542 F.2d 1283, 1316 (7th Cir. 1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1557, 51 L.Ed.2d 779 (1977), wherein it was held that

> "rarely are trials perfect, and improprieties in argument by counsel do not call for a new trial unless they are of a nature as probably to prejudice the defendant and the prejudice is not neutralized by the trial judge before submission of the case to the jury." (citation omitted).

**6.** As a final note, I would add that the record indicates that no objection to the remarks was made either during or after the prosecutor's closing argument. Consequently, I would question the propriety of raising this issue on appeal when the trial court was never given an opportunity to respond immediately to the alleged problem and to provide a limiting instruction, if indeed one was necessary. In ruling on a similar issue, the Third Circuit in *United States ex rel. Perry v. Mulligan,* 544 F.2d 674, 680 (1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977), commented that,

> We note also that defense counsel made no objection to these remarks nor did he request any corrective instruction from the trial court. In *Estelle v. Williams,* 425 U.S. 501 [96 S.Ct. 1691, 48 L.Ed.2d 126] . . . (1976), the Supreme Court again emphasized the necessity of entering an objection upon the rec-

## III.

The majority cites as the ground for reversal, the failure of the trial court to allow into evidence hearsay statements of Sheldon Moss to his secretary to the effect that Brainard and Bittick had no knowledge of the fraud. Having found Moss to be an unavailable witness, the majority concludes that his statements are admissible under Rule 804(b)(3). That rule states:

A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is *not* admissible unless corroborating circumstances *clearly* indicate the trustworthiness of the statement. (emphasis supplied.)

After a finding of nonavailability, the application of this rule has been held to require a two step analysis. First, "do the offered remarks come within the hearsay exception as a 'statement against interest?' and second, if they do, is there sufficient corroboration to clearly indicate trustworthiness." *United States v. Barrett,* 539 F.2d 244, 251 (1st Cir. 1976). *See also United States v. Alvarez,* 584 F.2d 694, 699 (5th Cir. 1978). It has been held that "the against-interest component of this exception poses a legal issue, [and] the consideration of the statement's trustworthiness raises a fact ordinarily to be reviewed according to a clearly erroneous standard." *United States v. Alvarez, supra,* at 701.

In the present case, Moss' statement to his secretary that Brainard and Bittick were not aware of the fraud is a statement against his interest to the extent that Moss is admitting that the investment scheme he created was a fraud. However, the statement with regard to his belief that Brainard and Bittick were without knowledge of the fraud is *not* against his interest, as all three could be guilty of separate but related offenses, and the guilt is not displaced from the accused to the declarant by Moss' statements. *See Barrett, supra,* at 252 ("exculpating Barrett was not in itself against Tilley's interest since both could

have participated in the crime."). Likewise, attempting to absolve Brainard and Bittick of knowing participation may very well have been *in* Moss' best interest. It must be remembered that the statements were made after the scheme had collapsed and the apprehension of Moss for both criminal and civil liability was certain. Thus, by exculpating Brainard and Bittick, Moss stood a chance of forestalling additional criminal liability on charges of conspiracy. *See United States v. Evans,* 635 F.2d 1124, 1126 (4th Cir. 1980), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981). (Admissions of guilt were found to be *in* rather than *against* the declarant's interest as the statement was designed to support a defense against a charge of a more serious crime.) It is not unlikely that Moss was aware of the full criminal liability to which he might be exposed as he had on previous occasions been the target of criminal investigations and an S.E.C. injunction.

Regardless of whether it is determined that Moss's statement in its entirety was "against his interest," the second requirement of the rule that corroborating circumstances "clearly indicate the trustworthiness of the statement" has not been met. As stated above, this decision is reserved to the discretion of the trial court under a clearly erroneous standard. The cases have been consistent and quite supportive of the trial court's discretion on this issue. *See, e.g., United States v. Barrett, supra,* at 253 ("We read this Rule as investing the district court with a substantial degree of discretion in making this important finding on trustworthiness.... In cases that are open to reasonable differences, this Court is unlikely to substitute its judgment for that of the district court."). In *United States v. Bagley,* 537 F.2d 162 (5th Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977), the Fifth Circuit outlined the deference to be given to the trial court's determination of trustworthiness, saying that

ord so that the trial judge would have an opportunity to remedy the error. The absence of protest may also be a gauge of the courtroom atmosphere. It may be assumed

that the prosecutor's oratory, although extended, fell short of being electrifying and defense counsel saw no need to do anything other than ignore it. (citations omitted).

[t]he requirement that the corroborating circumstances 'clearly indicate' the trustworthiness of the statement should be construed to permit the trial judge, who has the opportunity to judge the credibility of the witness, to exercise discretion in determining whether he is satisfied that the statement is trustworthy. If there is evidence before him from which he could conclude that the statement was not actually made (*or would not be reliable evidence of the truth of the matter asserted*) his exclusion of the statement should be affirmed. (emphasis supplied).

The majority indicates that Moss' statements were not mere opinion on the ultimate issue of guilt, but should be construed to mean that Moss had not told Brainard and Bittick that TVM was a fraud. If this analysis were taken one step further, Moss' statements, even if he himself believed them to be true, could only prove that Brainard and Bittick had not told him they were aware of his fraud. Viewed in this light, it does not appear that Moss' statements were "reliable evidence of the truth of the matter asserted"—Brainard and Bittick's lack of guilty knowledge—as Moss had no way of knowing what Brainard and Bittick actually knew about the fraud, regardless of what communications had or had not passed between them.

The trial court had before it substantial other evidence that Brainard and Bittick had knowingly participated in the fraud and had deliberately avoided inquiries and attempts to verify the authenticity of the TVM investment. Additionally, the statements in question here were made by Sheldon Moss, a man who had pleaded guilty to masterminding a fraud which was perpetuated by the use of an endless series of lies, fabrications, and cover-ups. Considering the nature of the crime and the confessór, I would consider any statements made by Sheldon Moss, other than admissions of his own guilt, to be highly suspect.[7] Ironically, even the defense counsel argued to the jury

that Moss lacked credibility, was a "conman", the "Wizard of Oz", and a liar. Under these circumstances, and in view of all the evidence presented at trial and the lack of corroborating circumstances which would *clearly* indicate the trustworthiness of the statements in question, I would find that the trial court was within its discretion when it excluded Moss' statements to his secretary. Additionally, even if sufficient corroborating circumstances were present and the district court, under the standard discussed above, was "clearly erroneous" in excluding the statements, I find that no prejudice resulted to the defendants, as the statements were substantially outweighed by the other evidence of guilty knowledge presented at trial. *See United States v. Hinkson,* 632 F.2d 382, 386 (4th Cir. 1980).

Consequently, for the reasons discussed above, I would find no prejudicial error and affirm the convictions.

---

**7.** In denying a post-trial motion for a new trial, a motion that was premised upon Sheldon Moss's willingness to take the stand in order to

exculpate the defendants, the trial court reaffirmed its earlier ruling, stating that "such a man is unworthy of belief."